[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. STATEMENT OF STATUTORY LAW AND FACTS
This is an appeal from a decision of the Planning and Zoning Commission of the Town of Westport denying the Plaintiffs' application for permission to construct a single-family residence on two lots. Since the lots are located directly on Long Island Sound, any construction on those lots is subject to the requirements of the Coastal Management Act, Connecticut General Statutes, Section 22a-90 et seq. (hereinafter CAM Act).
The Defendant Commission is charged with the implementation of the CAM act and the local Coastal Management Regulations, Section 31-8 et seq. of the Westport Zoning Regulations.
The CAM Act became effective in 1979 and established goals and policies in response to what the legislature found to be "(u)nplanned population growth and economic development in the coastal area. . . (which) caused the loss of living marine resources, wildlife and nutrient-rich areas, and. . . endangered other vital ecological systems and scarce resources." C.G.S. 22a-91 (7).
The Connecticut coastal area includes the land and water within the area delineated by the westerly, southerly and easterly limits of the state's jurisdiction in Long Island Sound; it also includes the Town of Westport, C.G.S. 22a-94 (a). Within the coastal area there is a coastal boundary. C.G.S. 22a-94 (b).
The local regulations were adopted "in order to carry out the policies and provisions" of the CAM Act as set forth in 22a-92, "and to provide more specific guidance to coastal area property owners and developers. . ." C.G.S. 22a-101(a).
Among the stated policies of Section 22a-92 of the CAM Act are the following:
 (a)(1) To insure that the development, preservation or use of the land and water resources of the coastal area proceeds in a manner consistent with the capability of the land and water resources to support development, preservation or use without significantly disrupting either the natural environment or sound economic growth. . . CT Page 2522
 (b)(2)(D) to manage intertidal flats so as to preserve their value as a nutrient source and reservoir, a healthy shellfish habitat and a valuable feeding area for invertebrates, fish and shore-birds. . . to allow coastal uses that minimize change in the natural current flows, depth, slope, sedimentation, and nutrient storage functions and to disallow uses that substantially accelerate erosion or lead to significant despoliation of tidal flats;
 (b)(2)(E) to preserve tidal wetlands and to prevent the despoliation and destruction thereof in order to maintain their vital natural functions. . .
 (b)(2)(I) to regulate shoreland use and development in a manner which minimizes adverse impacts upon adjacent coastal system and resources. . .
The regulatory scheme of the CAM Act requires that a coastal site plan be filed with the municipal zoning commission by anyone proposing to build within the coastal boundary. C.G.S.22a-109 (a). The scope of the Commission's review is to determine whether or not the potential adverse impacts on coastal resources and future water-dependent development activities are "acceptable". C.G.S. 22a-106 (a).
Section 22a-93 (15) sets forth examples of adverse impacts on coastal resources; one of them is in subsection A: "degrading water quality through the significant introduction into either coastal waters or groundwater supplies of suspended solids, nutrients, toxics, heavy metals or pathogens, or through the significant alteration of temperature, PH, dissolved oxygen or salinity."
On October 7, 1988, the Plaintiffs filed an application for review of a coastal site plan in connection with their proposal to build a single-family residence on the two lots. The property lies in the Residential A zone which is a single-family residential zone.
The Plaintiffs own One Cockenoe Drive, which lies to the north of the subject property and upon which they have their home. From this home they have an unobstructed view of Long Island Sound across the two lots. On the two lots they have "2 concrete pads like beach cabanas", a boat shed and a deck with awning for beach enjoyment. (Transcript of Appeal hearing 6/12/90 pp. 21 22). The lots were purchased after the Plaintiffs bought One Cockenoe Drive. Mr. Lunghino testified that he acquired Lot 32 in 1979 from James L. Karl for $75,000. The grantor had earlier entered into a Contract of Sale with a prospective buyer who wished to build upon the property. The Plaintiffs successfully opposed the CT Page 2523 development in court after the Zoning Board of Appeals had approved it. Mr. Lunghino testified that, although "all septic building approvals had been obtained by the developer to put up a three, unlawful, story (sic), four thousand square-foot house on the 75-foot. . . lot", he questioned the "propriety of them doing that, both from the standpoint of the septic system problems for pollution, since the water is on two sides of that lot." (Transcript of Appeal hearing, 6/12/90, p. 10). After reversal of the Zoning Board of Appeals in Lunghino's favor, Mr. Lunghino failed to convince Karl to apply for a variance; then Mrs. Lunghino purchased the property unconditionally from Karl for $75,000.
In 1984 Mr. Lunghino entered into a contract to purchase Lot 30, which lies to the east of Lot 32, from Edward Kelly, Jr. The contract was contingent upon the Plaintiffs obtaining all approvals to build. Before the conveyance was completed, the Plaintiffs filed an application for site plan approval to build upon the two combined lots under the CAM Act, which had now become law. The application was denied for failure to have a sedimentation control plan filed, as well as for failure to satisfy the CAM Act policies, although the approvals for the septic system were given. Despite the denial of the site plan, the Lunghinos did not appeal the decision and instead renegotiated the purchase price and completed the purchase in 1985 for approximately $85,000. Thereafter, in 1988 they filed another site plan application. After their proposal to build a single-family residence was disapproved on March 6, 1989 by the Defendant Commission, the Plaintiffs brought the instant appeal.
II. AGGRIEVEMENT
The Court finds that Anne Lunghino and Donald Lunghino are aggrieved in this appeal. Mr. Lunghino testified as to their ownership, as did Michael Gold, Appellants' appraiser. The Court, therefore, has subject matter jurisdiction over this administrative appeal.
III. ISSUES
The Plaintiffs allege that the Commission acted in an illegal, arbitrary and capricious manner and abused its discretion in denying their application; they state the Commission's reasons were overly broad and general. They further argue that such denial has led to a taking of their property without just compensation in derogation of their Fourth andFourteenth Amendment rights under the United States Constitution and under Article First, Section 11 of the Connecticut Constitution. An additional claim is that the Commission was predisposed to denying their application because it had decided that the property should CT Page 2524 be reserved for Open Space.
Upon appeal of a zoning commission's decision, the trial court reviews the record to determine whether or not the commission acted fairly or with proper motives or upon valid reasons. Whittaker v. Zoning Board of Appeals, 179 Conn. 650,654. It cannot substitute its own judgment for the Commission's by weighing the evidence in the record and determining issues of fact. Burnham v. Planning and Zoning Commission 89 Conn. 260,266. Where a zoning commission has stated the reasons for its action, a reviewing court may only determine if the reasons given are supported by the record and are pertinent to the decision. The commission's action must be sustained if even one of the stated reasons is sufficient to support its decision.
Torsiello v. Zoning Board of Appeals, 3 Conn. App. 47, 50.
In the present case the Commission gave several reasons for its denial of the application. The Court finds that the reasons which focus on the effect of septic effluent on the waters of Long Island Sound are supported by the record and are pertinent to its decision. Goldberg v. Zoning Commission, 73 Conn. 23, 25-26.
The septic issue was complicated by the fact that the applicants' presentation included discussion of two septic plans, one for a conventional system and the other for the Ruck system.
The Ruck system "expands on the septic effluent renovation potential of a standard subsurface septic disposal system" (Return of Record "ROR", Item 3, p. 8) by removing nitrogen, phosphates and other septic nutrients.
On December 5, 1988, Donald Ferlow, an environmental planner, testified for the applicants. He said:
 "We then went on and looked at the eight adverse impacts that are potential. And the first one is degrading water quality to the significant, and the word significant is key, introduction to either coastal waters or ground water supplies of solids, nutrients, toxics, heavy metals, pathogens, through the significant alteration of temperature, ph, dissolved oxygen or salinity. There was an applicable adverse impact to be studied. It related around the septic system primarily and that system has been designed by a professional engineer. It is a special system, the Ruck system for the property as well as the standard system which was designed first." (ROR Item 83, December 5, 1988, p. 44.)
Frank Bohlen, another environmental consultant who had completed a report for the applicants for the earlier unsuccessful CT Page 2525 application, also spoke of the Ruck system:
 "But to view it entirely from the Ruck standpoint without looking at the more common inground system, the quality of water that can be produced by the Ruck system is essentially above most water quality systems. . . When you take a look at the report, recognize that this is an area that is shellfished, this is an area that's a conditional shellfished area, which means that on occasion, the coloform counts get above acceptable standards. But those occasions tend to be periods when large volumes of sewage waters are introduced by malfunctions in the Saugatuck system or the Norwalk system. You take a look at the time response of the system to those periodic discharges, and you recognize that either with large volume discharges in the area, once those discharges are shut off, the area is able to return to acceptable levels very rapidly. You run those volumes against the volume that's coming out of a single family dwelling, and you recognize that you can't accurately predict what the effect of a single family dwelling impact might be. Not to mention that the Ruck system is producing an extremely high quality effluent." (ROR Item 83, December 5, 1988, p. 58, 59.)
The Plaintiffs' third witness, Peter Romano, was a consulting engineer whose firm had designed a conventional leaching system. He also advocated the utilization of the Ruck system in conjunction with the conventional one and said, "(T)he proposal is to construct a Ruck system." (ROR, Item 83, December 5, 1988, p. 138.) He introduced Dr. Rain Locke, the developer of the Ruck system, to the Commission; Dr. Locke spoke of the benefits of his system. Before learning that the conventional system would be installed without the Ruck system, (ROR, Item 83, January 9, 1989, p. 7) the Commissioners questioned Mr. Romano as to the time it would take septic effluent from the Ruck system to travel the 50 feet from the leaching field to the waters of Long Island Sound. Mr. Romano stated, "Within a day." Commissioner De Stefano stated that he believed the effluent needed to be retained 3 weeks in the ground. Dr. Locke agreed that ". . .bacteria. . . die roughly in about 21 days" and the travel time to the ocean was difficult to calculate.[1]
The Commission heard from John R. Trautman, who stated that he was an environmental consultant and had reviewed projects for consistency with the CAM Act on prior occasions. He agreed with a Commission member that use of a septic system on the site would not be consistent with the CAM Act because the entire site is "on beaches". (ROR, Item 83, December 5, 1988, p. 119; Item 49.) He answered questions directed by Commissioner Katz which focused on specific factors at the specific site. His analysis, dated January 1, 1989, states: CT Page 2526
 The aquifer recharge map locates the subject property on a course-grained stratified drift aquifier. . . (A) coarse-grained stratified drift allows effluents to percolate rapidly, but is less effective in removing bacteria, viruses, and nutrients. Therefore, the acquifer located beneath the subject property is highly susceptible to contamination because it transmits pollutants readily into the ground water. A septic system in this area requires special consideration in design due to the rapid permeability of the soil and high water table. (ROR, Item 49, December 5, 1988, p. 1.)
and he concludes that the result of the Plaintiffs' proposed development will be
 (d)egrading water quality through the significant introduction into either coastal waters or groundwater supplies of suspended solids, nutrients, toxics, heavy metals or pathogens, or through the significant alteration of temperature, pH, dissolved oxygen or sanity. The soils unit on the property site is excessively well-drained.
 The permeability is rapid or very rapid. The lower areas are subject to tidal inundation; the higher areas are inundated by storm tides or tides associated with coastal events. During high tides there is a corresponding high water table. The movement of septic effluent through the soil is so rapid that proper cleansing fails to take place. (ROR, Items 49, December 5, 1988, p. 7.)
The emphasis given to the Ruck system's greater efficiency accentuated the concern among the commissioners as to the reliability of the conventional system used alone. In any event, it appears that the Commission had heard enough from the experts to reach a conclusion that the integrity of the shoreland and the tidal wetlands would be compromised by a septic installation. The fact that the Health Department approved the installation of the conventional system was a fact to be considered by the Commission but it was not dispositive of the issue. The Commission, not the Health Department is the agency authorized to review coastal site plans which includes septic installations.
The Plaintiffs allege that the Commission's reasons were overly broad. The Court is satisfied that the Commission couched its decision in the framework of the CAM Act. Its reasons were sufficiently grounded in the specifics of the subject development and the testimony presented. The Court has considered the other issues raised by the Plaintiffs but finds there exists no basis CT Page 2527 for them.
Although various objections were raised such as the obstruction of vistas and view lines of Long Island Sound, the Commission concerned itself chiefly with the performance and effects of the septic installation on the coastal waters. As explained above, the Commissioners' reasons for denying the application, which rest on their discussions evidenced in the transcript, provide a basis for support for their decision.
The Plaintiffs argue that the Defendant's denial of their CAM application to construct a single-family residence on their waterfront lot has resulted in a "taking" of their private property without just compensation. By its action, Plaintiffs assert, the Town of Westport has effectively condemned their lot to be open space devoted to recreational uses. For the reasons outlined in the discussion which follows, the Court cannot find on the facts presented in this case that the Plaintiffs' property has been taken by the Defendant's action.
A municipality using its police power may regulate the use of private property because uncontrolled use would be harmful to the public interest, while conversely, eminent domain, takes property because it is useful to the public. Vartelas v. Water Resources Commission, 146 Conn. 650, 654; State v. Heller, 123 Conn. 492,496. In the instant case the Defendant was acting to regulate Plaintiffs' use of the subject parcel pursuant to its authority under the CAM Act and local regulations. The Plaintiffs have not challenged the legitimacy of the public interest sought to be achieved by the legislature through the CAM Act.
However, the police power to regulate private property is limited to the extent that regulation destroys the usefulness or unacceptably diminishes the value of private property; when the limitations on the regulatory power are exceeded, the power of eminent domain must be used. Vartelas, supra at 654. A taking of private property may occur without actual physical appropriation of the land if a substantial interference with private property destroys or nullifies its value or the owner's right to use and enjoyment is abridged or destroyed. Textron v. Wood, 167 Conn. 334, 336. Dooley v. Town Plan Zoning Commission, 151 Conn. 304, 311. In this case, Plaintiffs contend that the application of CAM Act standards to their property, while pursuant to legitimate government authority, has denied them any economically viable use of their land and has unacceptably diminished the value of the subject parcel in relation to its value as a building lot. See Agins v. Tiburon,100 S.Ct. 2138. Defendant's action, Plaintiffs assert, has resulted in the illegal inverse condemnation or practical confiscation of his property. CT Page 2528
"Short of regulation which finally restricts the use of property for any reasonable purpose resulting in a practical confiscation, the determination of whether a taking has occurred must be made on the facts of each case with consideration being given not only to the degree of diminution in the value of the land but also of public harm to be prevented and to the alternatives available to the landowner." Chevron Oil Co. v. Zoning Board of Appeals, 170 Conn. 146, 151; Brecciaroli v. Commissioner of Environmental Protection, 168 Conn. 349, 355. The Plaintiff bears the burden of proving there is no other reasonable use for the property. See Huck v. Inland Wetlands and Watercourses Agency, 203 Conn. 525, 553 n. 18. Until it appears that the Plaintiff has been finally deprived. . . of the reasonable and proper use of the property, it cannot be said that there has been an unconstitutional taking of property without just compensation. Manor Development Corp. v. Conservation Commission, 180 Conn. 692, 695.
Plaintiffs contend that denial of a permit to construct a single-family residence on a half-acre lot which is located in a half-acre single-family residential zone deprives the lot of any "practical utility." Defendant argues to the contrary that the lot retains its reasonable and proper use as a private recreational area and beach serving the Plaintiffs' residence. Nor has there been a decrease in the value of the property in relation to its value as a building lot because, Defendant argues, the parcel has never been afforded the status of an approved building lot.
Consequently, it is submitted, for the Court to find that the Plaintiffs' property has been taken as a result of the CAM application denial, the facts of the case must lead the Court to conclude that either the lot has been deprived of all reasonable and proper use or that its value has been so diminished as to constitute its confiscation without compensation. The facts of this case do not lead to either conclusion.
Preparatory to consideration of the Plaintiffs' claims, it is useful to repeat some of the facts relevant to these claims. The subject parcel consists of two contiguous, pre-existing nonconforming lots. The westernmost lot, Lot 32, abuts a small, town-owned beach and is located directly south of and across the street from the Plaintiffs' personal residence. Mr. Lunghino purchased this lot in 1979 for $75,000.00 soon after the Plaintiffs successfully appealed the grant of a permit to build a house on the lot directly in front of the Plaintiffs' home.
The second lot, Lot 30, lie to the east of Lot 32, is approximately the same size and was purchased by Mr. Lunghino in CT Page 2529 1985. Plaintiff testified that he entered into a contract to purchase the lot contingent upon obtaining CAM approval to build on the two lots combined, as here, into one, larger lot. The CAM application was denied by the Town and Plaintiff chose not to appeal the denial. Despite the denial, Mr. Lunghino renegotiated the contract and purchased the property for approximately $85,000.00 which represented a 30-40% reduction in the purchase price. (Transcript. June 12, 1990, p. 29.)
The photographs in the Record confirm that the subject parcel is beach frontage.
Analysis of the taking issue in Connecticut employs two tests, namely the practical confiscation test and the balancing test. Under the "practical confiscation" test, the Court determines whether or not the land use regulations restrict the use of the property to such an extent that the property cannot be used for any reasonable purpose resulting in an unconstitutional taking of the property. Even where land use regulations do not amount to a practical confiscation, restrictions may be sufficiently severe to result in an unconstitutional taking under the balancing test. The balancing test weighs the degree of diminution of the value of the land against the nature and degree of public harm to be prevented and the alternatives available to the land owner, Brecciaroli v. Commissioner of Environmental Protection, supra, 356, Horwitz v. Waterford, 151 Conn. 320, 323-324.
Cases decided by the U.S. Supreme Court state a similar test for determining whether government regulations amount to a taking under the U.S. Constitution: (1) the economic impact of the regulation on the property; (2) the extent to which the regulation has interfered in investment-backed expectations; (3) the character of the governmental action, i.e., whether there is physical invasion by government, as opposed to interference by regulation or a program which promotes the public interest. These are factors that have been identified as having particular significance. Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124; Kaiser Aetna v. United States,444 U.S. 164, 175; Hodel v. Irvina, 481 U.S. 107.
Plaintiffs' first claim is that all practical or meaningful use of the property has been destroyed by the CAM denial. They contend that without the right to build a single-family residence on a lot located in a zone devoted to single-family residential use, the lot is essentially useless.
The subject property is in the Residence A District of Westport which is a single-family residential zone requiring a minimum half-acre lot size. Section 13-1 of the Zoning Regulations of the Town of Westport sets forth the purpose of the CT Page 2530 zone. The District A provisions are intended to encourage moderate density residential development for primarily residential and related purposes in areas primarily served by centralized sewerage facilities. The following uses are among those specifically permitted in the District A zone subject to special permit and site plan approval: recreational clubs and other private recreational facilities (Section 11-2.2.3), private non-commercial boathouses, landings and docks (Section 11-2.2.10).
The Record reveals that the property is currently used for some of these purposes in that it serves in fact as a private beach for the Plaintiffs' residence. Plaintiffs contend that since the property "is no longer available" for residential use it "has been reduced to open space for recreational use". Implicit in this argument is the conclusion that use of the property as recreational open space does not come within the "reasonable and proper use" required in the caselaw. See Bartlett v. Zoning Commission, 161 Conn. 24, 27, 31 (wherein change of municipal zone from residential and commercial to tidal wetlands and marshlands in which Plaintiff could erect only walkways, wharves, duckblinds, and public boat landings, or a single private boathouse rendered property useless and was found to be an unconstitutional, uncompensated taking); Dooley v. Town Planning and Zoning Commission, 151 Conn. 304, 311 (wherein zone change from residential to flood plain district froze the area into a practically unusable state so as to amount to a practical confiscation of the land).
Unlike the cited cases wherein the Court found a taking because municipal regulatory action changed the classification, and hence permitted uses, of the Plaintiffs' private property, here there has been no change wrought by the Defendant's action. These cases are further distinguished because none of these involved usable beach property. The Plaintiffs here continue to enjoy ownership of a private, half-acre beach which serves their adjoining residential property and provides a buffer insuring the residence retains its unobstructed views of Long Island Sound.
Accordingly, the present use of the property by the Plaintiffs as a private beach and boating area is reasonable and proper under the applicable Residence A District regulations and is consistent with CAM Act standards.
Consequently, the Plaintiffs have not met their burden of demonstrating facts that Defendant's final denial of their CAM application so restricted the use of their property for any reasonable purpose so as to result in a practical confiscation of the parcel.
Under the balancing test the Court must determine whether or CT Page 2531 not a purported exercise of the police power amounts to a taking. In making this determination the Court considers the character of the action and the extent of interference with the rights in the parcel as a whole, Penn Central Transportation Co. vs. City of New York, supra, and the amount of the owner's loss is the basic criterion for determining it. Luf v. Southbury, 188 Conn. 336,349; Figarsky v. Historic District Commission, 171 Conn. 198,210. However, merely because the total value of the property has decreased does not justify a conclusion that there has been an unconstitutional taking. Manor Development Corp. v. Conservation Commission, supra, 695.
At the hearing on the administrative appeal both parties introduced expert written appraisals of the property by real estate appraisers licensed by the State. In each case, the appraisers performed two independent calculations of the market value of the property. The first calculation was based on its value as an approved building lot and the second figure on the property's value as an unbuildable waterfront parcel. Coincidentally, both the appraisers arrived at the same value, $900,000.00, for the property as an approved building lot. However, the appraisals of the property after final denial of CAM approval as an unbuildable lot differed significantly. The Plaintiffs' appraiser calculated the second figure to be approximately $90,000.00. The Defendant's appraiser estimated that parcel's value as an unapproved lot at $400,000.00. Plaintiffs contend that the Defendant's action has resulted in the diminution of the value of their land from $900,000.00 to $90,000.00, or a decrease of 90% in the market value of the parcel. The Defendant contends that any diminution does not exceed 56%.
The measure of damages for a taking is ordinarily the fair market value of the acquired land on the day of the taking. Tandet v. Urban Redevelopment Commission, 179 Conn. 293, 298; D'Addario v, Commissioner of Transportation, 172 Conn. 182, 184.
Both appraisers used the Sales Comparison Approach to obtain a value on the property as an approved building lot. Both agreed that with CAM application approval, the highest and best use would be single family residential. The Plaintiffs' appraiser, Michael Gold, rendered his opinion that denial of the CAM application would effectively limit the utility of the subject beachfront property to "open space or conservation use and the most likely purchaser would be a neighboring property owner" (Plaintiffs' Trial Exhibit B, p. 5). In that case, the property would be valued at $90,000.00. He provided an analysis of the effect on the value of the Plaintiffs' present dwelling at One Cockenoe Drive of the loss of the subject property as "view protection" for One Cockenoe Drive. He compared the sale price of two homes which CT Page 2532 had unobstructed water views of Long Island Sound. Both residential properties appeared comparable in style, size, condition and amenities. (Sale No. 7 and Sale No. 8, Plaintiffs' Exhibit B, p. 11.) The sale price of No. 7 was $795,000.00 on December 27, 1988; the sale price of No. 8 was $1,200,000.00 on June 1, 1989. However, neither property appeared to be a private beach. (Plaintiffs' Exhibit B, "Map Showing Location of Subject Property and Sales".)
The Defendant's appraiser, Ronald D. Glendinning, provided a paired sales analysis to reach a conclusion as to the value of the subject property in the event of denial of CAM approval. "The object of this paired sales technique is to adjust all variables other than the waterfront/water view amenity, which amenity becomes residual", (Plaintiffs' Exhibit A, p. 32). To that end, the property known as Paired Sale "A" without water frontage sold for $783,000.00 on May 6, 1988; Paired Sale "A Prime" with water frontage and a deep mooring sold for $1,200,000.00 on June 23, 1989. The difference between the two sale prices of approximately $421,000.00 is the residual value ascribed to water frontage or view. He therefore concludes that the subject property has an "enhancement value" of $400,000.00 to the Plaintiffs' present home, which lies across the road from the subject property, and "a similar enhancement to value" of a property belonging to Plaintiffs' neighbor. He differs with the Plaintiffs' appraiser in that he concludes that the highest and best use, absent CAM application approval is "recreational use including beach use and boating". (Plaintiffs' Exhibit A, p. 12.) Where in the opinion of the appraiser the property is not, on the date of taking, being put to its highest and best use, it is incumbent upon the appraiser to provide. . . evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future. Tandet v. Urban Development Commission, supra, 299. The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land. Id. at 300.
On the facts here, the $900,000.00 appraisal value for the parcel as an approved building lot is not a reasonable or relevant basis from which to determine a decrease or diminution in the value of the Plaintiffs' land. Notwithstanding the Plaintiffs' contention that the parcel "was always acknowledged to be a building lot", the Record clearly demonstrates that the parcel has been the subject of three unsuccessful attempts to obtain approved building lot status over a period of ten years. Clearly, the Plaintiffs, who purchased both lots after unsuccessful attempts to develop them were well aware of the difficulty inherent in developing these particular beach front properties for residential purposes and could not, as prudent investors, consider their use CT Page 2533 as a building lot reasonably probable in the near future.
When the first lot was purchased in 1979, the Plaintiffs already knew that although septic approvals had been obtained by James L. Karl, the lot was not buildable. Mr. Lunghino testified as to the "septic system problems for pollution". (Transcript June 12, 1990, p. 10.) Nevertheless, the Plaintiffs paid $75,000.00. Several years later they purchased the second lot from Edward J. Kelley, Jr., after failing to prevail on an application to build upon both lots. The price of $85,000.00 was "a gold 30% less, 40% less". (Transcript, June 12, 1990, p. 29.) When the second lot was purchased, the Plaintiffs had actual notice and knowledge of the requirements pursuant to the CAM Act. The testimony as to the reduced price indicates that the Plaintiffs accepted the value of the second parcel to be reduced accordingly.
Plaintiffs' appraiser however, concludes that the maximum value of subject property as non-buildable land is 10% of its value as an approved building lot. He believes that the price of $75,000.00 paid in 1979 "was at a premium if it related only to view protection", (Plaintiffs' Exhibit B, June 12, 1990, p. 9). However, it is evident that more than view protection was purchased; the Plaintiffs obtained the ownership rights to a beach as evidenced by their placement of a cabana and other appurtances of beach living on the lot. "The maximum possible enrichment of a property owner is not a controlling consideration in land use matters." State National Bank of Connecticut v. Planning and Zoning Commission, 156 Conn. 99, 102. Even in the event the total value of the property has been significantly decreased by the application of the CAM Act, that fact, in and of itself, does not amount to an unconstitutional taking. Samp Mortar Lake Co. v. Town Plan and Zoning Commission, 155 Conn. 310, 313-315; Manor Development Corporation v. Conservation Commission, supra, 695; Penn Central Transportation Company v. City of New York, supra, 130. A claim of confiscation fails where the property owner derives some economic benefit from the property, although not as much as would be possible without the land use restriction. State National Bank of Connecticut v. Planning and Zoning Commission, supra, 102-105; Zygmont v. Planning and Zoning Commission, 152 Conn. 550, 555; Samp Mortar Lake Co. v. Town Plan and Zoning Commission, supra, 314, 315; Manor Development Corporation v. Conservation Commission, supra, 695-697.
In Namon v. State of Florida, Department of Environmental Regulation, 558 So.2d 504 the Florida Court considered the inverse condemnation claim of the appellants who were denied a permit by the Florida Department of Environmental Regulation to fill one-half acre of land to support a homesite and allow drainage of a septic tank. They had signed a contract to purchase CT Page 2534 unimproved acreage in wetland. The Agreement for Deed expressly stated that the property was not offered for use as a homesite. The Court found the appellants had constructive knowledge of the applicable land use regulations and actual notice from the Contract that land use restrictions might preclude development of the property. The Court stated that a "subjective expectation that land could be developed is not more than an expectancy and does not translate into a vested right to develop property. The property continues to exist in the state in which appellants have contracted to acquire it." (at 505)
The Plaintiffs' witnesses stated a best case scenario; nevertheless, intimations of environmental damage appear throughout the record. They concern the possible heaving of and leakage from the underground oil tank if not properly installed and maintained (ROR, Item 83, 12/5/88 at 157, 158) and the fact that the high water mark changes and can move inland thereby increasing the percentage of the building's coverage of the lot. (ROR, Item 83, 12/5/88, pp. 146, 147).
Further, the Plaintiffs' experts minimized the risk of damage by suggesting that a Site Monitor or environmental specialist supervise phases of development; but they did not offer remedies should there be damage beyond "acceptable impacts". (ROR, Item 83, pp. 53, 159, 160.)
Although the Plaintiffs made significant changes from their earlier plans such as raising the house on columns, and proposing to plant appropriate vegetation to replace that lost during construction, the cumulative effect of the vagaries of nature and of the human element involved together with the potential of contaminating the coastal waters and shellfish increased the risk of environmental damage beyond acceptable limits.
The instant case is distinguished from Gil v. Inland Wetlands and Watercourses Agency, 23 Conn. App. 379. In that case the Plaintiff purchased property possessing value as a building lot. Here the Plaintiffs purchased the pieces knowing that hitherto they were not deemed buildable. The fact that this property is in a single-family residential zone does not automatically confer upon it building lot status. The Commission did not refer to prior applications and consider the Plaintiffs' earlier plans in denying the present one, but treated the new application as a separate and distinct one. The value of this lot has not been totally destroyed. The lot has reasonable use and desirability both as a private beach and as a view enhancer.
In addition, the Plaintiff in Gil presented evidence that no problems or adverse effects would result from development of the wetlands; and an environmental scientist testified that there were CT Page 2535 no superior alternatives to the Plaintiffs' proposal. Conversely, in the instant case, the Plaintiffs' witnesses discussed a superior alternative to the proposal of a conventional septic system, namely the Ruck system. (See ROR, Item 17, p. 1.) However, the Ruck system was eliminated from the proposal before the Commission voted. Whereas in Gil, the Defendant's own witness did not claim the development and septic system would pollute the wetlands, the Plaintiffs' witnesses here could not deny that some pollution could occur. (See footnote 1; also, ROR, Item 83, 12/5/88, pp. 58, 59 infra, p. 8.)
The Court will not reiterate the policies set forth in the CAM Act. They speak to the State's need to protect its coastal area and waters. They embody a concern to shield its aquatic life, a food supply, coastal waters from pollutants contaminants that threaten the public's health. The public benefit to be derived from protecting coastal waters from contamination and coastal areas from despoliation outweighs the diminution in value claimed here by the Plaintiffs.
For the foregoing reasons, the appeal is denied.
SANDRA VILARDI LEHENY, JUDGE