WILLIAM H. TANDET ET AL. *v.* URBAN REDEVELOPMENT COMMISSION OF THE CITY OF STAMFORD

COTTER, C. J., LOISELLE, LONGO, PETERS and HEALEY, Js.

Argued June 6—decision released December 4, 1979

*Robert M. Wechsler,* with whom was *Elaine T. Silver,* for the appellant (defendant).

*Julius B. Kuriansky,* with whom, on the brief, was *Marshall Goldberg,* for the appellees (plaintiffs).

ARTHUR H. HEALEY, J. This appeal was taken by the defendant Urban Redevelopment Commission (hereinafter URC) from the reassessment of damages awarded by a state trial referee for a partial taking of the plaintiffs' land in downtown Stamford. The finding discloses the following factual setting: The plaintiffs' property consisted of a five-story brick building with a two-story warehouse physically attached to the rear of the building. When the plain-

tiffs purchased the property in 1967 it was subject to a twenty-year lease for the period from August 1, 1962 to July 31, 1982. From the inception of the lease until the time of taking, the building was used as a department store with an adjoining warehouse. On July 27, 1973, the defendant notified the plaintiffs of its intention to take part of the property to facilitate the construction of a parking garage. On June 18, 1974, the defendant notified the plaintiffs that it would be necessary to demolish the warehouse, and on September 3, 1974, the defendant filed a formal notice of taking of 864 square feet of the plaintiffs' property and deposited with the clerk of the Superior Court $32,800 as damages. See General Statutes § 8-130. The defendant filed, on May 29, 1975, a second notice of taking in which it obtained the right to demolish the entire warehouse and a temporary easement over the plaintiffs' remaining property to facilitate its demolition. For this taking the defendant deposited one dollar with the clerk as damages. The warehouse was demolished in July, 1975. The lease between the plaintiffs and their tenant, Supermarket General Corporation, provided, in part, that in the event the subject premises were partially taken by eminent domain and an architect, selected by the tenant and satisfactory to the landlord, concluded that the tenant's ability to use the remainder of the premises would be substantially reduced, the tenant would have the power to terminate the lease. After an architect selected in accordance with the lease so concluded, Supermarket General notified the plaintiffs on November 13, 1974, that it would terminate the lease and surrender possession of the premises on January 11, 1975.

The plaintiffs applied to the Superior Court, pursuant to General Statutes § 8-132, for review of the

defendant's statement of compensation. The matter was referred to a state referee, who was presented with three appraisal reports. Two reports were introduced by the defendant; one assessed damages at $32,800 and the other assessed damages at $38,500. Neither of the appraisers selected by the defendant was aware of the tenant's election to terminate the lease and neither report included this factor in the determination of damages. The plaintiffs introduced an appraiser's report that fixed damages for the property taken and those resulting to the remainder at $210,000. The plaintiffs' appraiser, Norman Benedict, was engaged by the plaintiffs in June, 1975, and knew at the time that his report was prepared that the tenant had terminated the lease and evacuated the building.[1] The referee, after hearing the evidence, adopted Benedict's appraisal and awarded damages to the plaintiffs in the amount of $210,000.

On appeal the defendant claims: (1) that the finding should be corrected in several respects; (2) that the court erred in adopting Benedict's appraisal because the before-taking value of the property was based on a future highest and best use that was speculative and conjectural; (3) that the court erroneously concluded on the basis of Benedict's report that the termination of the lease with Supermarket General was an economic detriment and not a benefit; and (4) that the court erred in concluding that the construction of a parking garage adjacent to the plaintiffs' remaining property conferred no special benefit to the property that would increase its after-taking market value.

---

[1] Norman Benedict did not inspect the property until the summer and fall of 1975 and his report was not typed until February, 1976.

## I

We turn first to the issues raised by the defendant's attack on the finding. The defendant claims that the court erred: (1) in refusing to find certain material facts said to be admitted and undisputed; (2) in finding certain facts without evidence; and (3) in finding certain facts in language of doubtful meaning so that their real significance may not clearly appear in view of their relationship to other facts found. Each of these claims has been examined carefully and the finding is corrected by adding two paragraphs of the draft finding which we find to be either admitted or undisputed.[2] Some of the facts contained in other paragraphs of the draft finding sought to be added are neither admitted nor undisputed; some are implicit in the finding, and others, even if added, would not affect the result. See *Salvatore* v. *Milicki*, 163 Conn. 275, 277, 303 A.2d 734 (1972). In view of our disposition of this case, no further correction of the finding is necessary. See *Krause* v. *Krause*, 174 Conn. 361, 364, 387 A.2d 548 (1978).

## II

The defendant claims that the referee erred in admitting into evidence, and later relying upon, the report of the plaintiffs' appraiser on the ground that the proposed highest and best use of the property projected in the appraiser's determination of

---

[2] The following paragraphs of the draft finding are added to the finding:

(1) "An investor in properties of the type owned by plaintiffs generally expect a return of approximately 12% on their investment."

(2) "Mr. Benedict considered the income from the lease as a positive element in valuing plaintiffs' property."

the before-taking market value of the land was remote and speculative. The plaintiffs' appraiser, Norman Benedict, predicated his before-taking valuation on the retail tenant's continued occupancy of the property for seven years and eleven months, the remaining period of the lease term. He then projected at the end of the tenancy a highest and best use of the property different from the existing use, based on forecasts of population growth, per capita buying income, commercial construction costs, operating expenses and rental income. Benedict concluded that the most profitable use to which the property could be applied nearly eight years in the future would be as an office building. His appraisal of the before-taking value of the whole property was based on these projections.

Under our constitution, no property shall be taken for a public use without just compensation. Conn. Const., art. 1 § 11. This has been interpreted to mean that the condemnee is entitled to receive a fair equivalent in money for the property taken, as nearly as its nature will permit. *Schnier* v. *Commissioner of Transportation,* 172 Conn. 427, 431, 374 A.2d 1087 (1977); *Colaluca* v. *Ives,* 150 Conn. 521, 530, 191 A.2d 340 (1963). The measure of damages is ordinarily the fair market value of the acquired land on the day of taking. Ibid. Where only a part of a tract of land is taken for the public use, the award will include the value of the part taken as well as any damages visited upon the remainder as a result of the taking. *D'Addario* v. *Commissioner of Transportation,* 172 Conn. 182, 184, 374 A.2d 163 (1976). In *Lefebvre* v. *Cox,* 129 Conn. 262, 265, 28 A.2d 5 (1942), we stated: "The ordinary rule for measuring damages where a portion of a tract of land is taken is to determine the difference

between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter, taking into consideration the changes contemplated in the improvement and those which are *so possible of occurrence in the future that they may reasonably be held to affect market value."* (Emphasis added.) See *Andrews v. Cox,* 127 Conn. 455, 17 A.2d 507 (1941). In determining the market value of the remainder after a partial taking we have said that "it is proper for the trier to consider all elements which are a natural and proximate result of the taking and which could legitimately affect the price a prospective purchaser would pay for the land." *Bowen* v. *Ives,* 171 Conn. 231, 236, 368 A.2d 82 (1976). Because fair market value has been defined simply to mean that price that a willing seller and a willing buyer would agree upon following fair negotiations; see *Lynch* v. *West Hartford,* 167 Conn. 67, 73, 355 A.2d 42 (1974); Uniform Eminent Domain Code § 1004 (a); 27 Am. Jur. 2d, Eminent Domain § 267; an appraisal of fair market value should take into consideration that use of the property that would provide a prudent investor the greatest financial return. *Connecticut Printers, Inc.* v. *Redevelopment Agency,* 159 Conn. 407, 411, 270 A.2d 549 (1970); 4 Nichols, Eminent Domain (3d Ed.) § 12.314. Where in the opinion of the appraiser the property is not, on the date of taking, being put to its highest and best use, it is incumbent upon the appraiser to provide the trier with sufficient evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future. See *Olson* v. *United States,* 292 U.S. 246, 255, 54 S. Ct. 704, 78 L. Ed. 1236 (1934); *Mississippi*

& *Rum River Boom Co. v. Patterson,* 98 U.S. 403, 408, 25 L. Ed. 206 (1879); *United States v. 1291.83 Acres of Land, Commonwealth of Kentucky,* 411 F.2d 1081, 1084–1086 (6th Cir. 1969); *Levine v. Stamford,* 174 Conn. 234, 235, 386 A.2d 216 (1978); 4 Nichols, Eminent Domain (3d Ed.) §§ 12.314, 18.11[2]; 1 Orgel, Valuation Under Eminent Domain (2d Ed.) § 31, and cases there cited; 27 Am. Jur. 2d, Eminent Domain § 280. "The uses to be considered must be so reasonably probable as to have an effect on the *present market value of the land.* Purely imaginative or speculative value should not be considered." (Emphasis added.) *Pruner v. State Highway Commissioner,* 173 Va. 307, 310–11, 4 S.E.2d 393 (1939). In the absence of such a showing, evidence of the proposed use is too remote and speculative to have any legitimate effect upon the valuation; see *McGovern v. New York,* 229 U.S. 363, 372, 33 S. Ct. 876, 57 L. Ed. 1228 (1913); and, hence, should not be admitted for that purpose. See *Skyline Homes, Inc. v. Commonwealth,* 362 Mass. 684, 687–88, 290 N.E.2d 160 (1972).

In the facts of the case before us, a portion of the property taken was subject to a twenty-year lease, seven years and eleven months of which had yet to run on the date of taking. Under the circumstances, we conclude that Benedict's valuation of the before-taking market value of the whole tract, based, as it was, on the existing use and the projected profits from a highest and best use to which the property might be devoted nearly eight years from the date of taking,[3] was improperly admitted into

---

[3] In fact, Benedict, in determining the before-taking value, appraised the "mature property value" as of 1984, approximately ten years after the date of taking.

evidence and relied upon by the referee. See 4 Nichols, Eminent Domain § 13.3[2]; *Eljay Realty Co.* v. *Argraves,* 149 Conn. 203, 207, 177 A.2d 677 (1962). Although we are mindful of the sophisticated appraisal methods utilized in the profession and the quantum of statistical forecast data available, we are also mindful of the inherent unreliability of many such distant projections, which must, of necessity, take into consideration numerous factors and variables, known and unknown, that influence investment decisions. See *Mississippi & Rum River Boom Co.* v. *Patterson,* supra. That is not to say that the referee may not consider some future change of use. We hold, however, that where a tract of land that is taken for public use is subject to a committed use for an extended period of time, a determination by the trier of its fair market value must be predicated on the existing use of the land and improvements; he may also consider the impact on present market value of any more profitable use to which the property may be devoted at the end of the term of committed use. Evidence of the distant cost of the conversion or the profits to be derived therefrom, however, would be speculative and, therefore, inadmissible. See 4 Nichols, Eminent Domain (3d Ed.) § 12.314, pp. 12-274 to 12-275; 5 Nichols, op. cit. § 18.11[2], pp. 18-54 to 18-57; *United States* v. *1.16 Acres in Stamford,* 300 F. Sup. 1021, 1023–1024 (D. Conn. 1969); *Andrews* v. *Cox,* 127 Conn. 455, 462, 17 A.2d 507 (1941); cf. *United States* v. *1291.83 Acres of Land, Commonwealth of Kentucky,* 411 F.2d 1081, 1084 (6th Cir. 1969); *Levin* v. *New York,* 13 N.Y.2d 87, 89–92, 192 N.E.2d 155 (1963).

Because the referee not only admitted into evidence these distant projections but relied heavily upon them in arriving at the compensation award,

the error is not harmless.[4]  See *Mei* v. *Alterman Transport Lines, Inc.*, 159 Conn. 307, 316–17, 268 A.2d 639 (1970); Maltbie, Conn. App. Proc. §§ 17, 23.

## III

The defendant claims that the court erred in concluding that the lease between the plaintiffs and Supermarket General Corporation was an economic benefit and not a burden to the plaintiffs' property. The defendant bases this contention on the fact that the lease had generated only a 4.9 percent return on investment from 1972 through 1974 and that the typical investor would expect a 12 percent return on a similar investment.[5]  See footnote 2, supra. Relying upon the plaintiffs' own appraiser's opinion, the defendant reasons that if the highest and best use of the property is for office rental, then its availability for that use four months after the taking, rather than nearly eight years after the taking (had the lease not been terminated), would be an economic benefit to the plaintiffs rather than a detriment.

---

[4] Although our conclusion on this issue necessitates a remand for recommittal, we consider the remaining claims because they will likely arise in the subsequent proceedings.

[5] According to the lease with Supermarket General Corporation, the tenant was to pay for insurance, heat, utilities, maintenance and taxes on the land and building as well as 2.75 percent of its yearly gross receipts, but in no event less than $25,000 a year. During the time that the plaintiffs owned the property it produced the following net income:

| | |
|---|---|
| 1968 | $53,774.00 |
| 1969 | 49,753.00 |
| 1970 | 44,231.00 |
| 1971 | 32,918.00 |
| 1972 | 25,000.00 |
| 1973 | 25,000.00 |
| 1974 | 25,000.00 |

The defendant's assertion is logical. But an examination of Benedict's report and the finding discloses the factors that minimize any benefit to the plaintiffs resulting from the early availability of the property for conversion to the recommended use. Firstly, although the income history of the property reveals a consistent decline; see footnote 5, supra; Benedict opined in his before-taking valuation that the retail tenant's gross receipts would increase immediately and consistently during the remaining lease term. This projection, though dramatic, the referee was free to adopt.[6] In addition to this factor, however, Benedict based his after-taking valuation upon the hypothetical termination of the tenant's lease on the date of taking, when, in fact, the tenant left the premises approximately four months thereafter. Benedict made this assumption notwithstanding that the lease provision dealing with the tenant's rights upon a partial taking of the property by eminent domain allowed the tenant to terminate the lease only upon the conclusion of an architect, selected by the tenant and satisfactory to the landlord, that the loss caused by the taking would substantially reduce the tenant's ability to use the premises as it had originally intended. It is clear that the certification process would consume some time, as in fact it did, and that a prudent prospective buyer, aware of the provisions of the lease, which had been recorded on the land records, would want to know the status of the lease before purchasing the property. The facts of this case indicate, however, that the tenant's decision to terminate the lease was a reasonably probable and foreseeable

[6] Benedict described the low rental income between 1972 and 1974 as a temporary decline resulting from redevelopment activities in the downtown area.

consequence of the taking. See *Heath* v. *Commissioner of Transportation,* 175 Conn. 384, 387–88, 398 A.2d 1192 (1978). The date on which the lease would be terminated, on the other hand, was not, on the date of taking, foreseeable. We are confronted then with an appraiser's hypothetical treatment of a factor bearing upon the after-taking market value of property partially acquired by the city which is in direct conflict with the events that subsequently transpired and were in fact known to the appraiser. While it is true that the fair market value of land that is taken, or the remainder of land partially taken, is ordinarily measured on the date of the taking, we know of no reason, and counsel have presented us with none, for an appraiser who seeks to establish market value to rely upon hypothetical projections of events subsequent to the taking when facts indicating what actually occurred are readily available. The United States Supreme Court was faced with an analogous situation in *Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.,* 289 U.S. 689, 53 S. Ct. 736, 77 L. Ed. 1449 (1933), where the value of a patent was to be determined on a certain date and a substantial period of time had transpired between that date and the date on which evidence of its value was to be offered in a judicial proceeding. The District Court had decided that evidence of the use to which the patent was put was inadmissible. Mr. Justice Cardozo, writing for the court, disagreed and stated: "Experience is [now] available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." Id., 698; see also *United States* v. *Westinghouse Electric & Mfg. Co.,* 339 U.S. 261, 70 S. Ct. 644, 94 L. Ed. 816 (1950).

New York's highest court adopted this more realistic approach to appraisals in eminent domain cases in 1909, when it ruled on the propriety of excluding from consideration any actual damage caused by the partial taking of certain property to construct an underground train roadway. The Court of Appeals stated: "In estimating the market value on this basis, the experts were confined to supposition and speculation . . . and they were not allowed to consider the realities as shown by time and experience. The test presented to them was what the market value would probably be if an intending purchaser knew that the road was to be built. This left everything open to the mere estimate of experts, not founded on fact but on conjecture. Certainty is better than conjecture and the injuries actually inflicted a better guide than the opinions of experts as to the market values just before and just after the . . . [taking], or during the same five minutes." *In re Board of Rapid Transit Railroad Commissioners,* 197 N.Y. 81, 108, 90 N.E. 456 (1909). The court continued: "We think it was the duty of the commissioners to receive evidence relating to the condition of the properties down to the time of the trial and to note the effect thereon of the work in fact done at that time. Evidence as to the physical injuries which had actually been inflicted and could be seen, touched and measured, was competent and should have been received . . . ." Id., 108–109; see 5 Nichols, Eminent Domain § 23.4; accord, *Wing* v. *Commonwealth,* 359 Mass. 286, 290–91, 268 N.E.2d 658 (1971); *Kennedy* v. *Commonwealth,* 336 Mass. 181, 183, 143 N.E.2d 203 (1957); *Boyne City, G. & A. R. Co.* v. *Anderson,* 146 Mich. 328, 330–31, 109 N.W. 429 (1906); *Stratton* v. *Town of Jaffrey,* 102 N.H. 514, 516–17, 162 A.2d 163 (1960); *Wein-*

*schenck* v. *Western Allegheny R. Co.*, 233 Pa. 442, 448–49, 82 A. 750 (1912) ; *State* v. *Rascoe,* 181 Tenn. 43, 49–52, 178 S.W.2d 392 (1944) ; *Houston Belt & Terminal Ry. Co.* v. *Wilson,* 176 S.W. 907, 908 (Tex. Civ. App. 1915). We endorse this approach.

We point out that evidence of actual damages caused by the taking is not to be received to alter the formula for awarding just compensation or to modify the legal effect of the taking, but to show more accurately the nature of the property interest taken by the condemnor. 5 Nichols, loc. cit. Thus, the actual costs to the owner of adapting the remaining property to a new use, while not recoverable in themselves, are relevant, if reasonable, as evidence affecting the market value of the remaining property. See *Andrews* v. *Cox,* 127 Conn. 455, 462, 17 A.2d 507 (1941) ; see also 5 Nichols, op. cit. § 23.1; *Research Associates, Inc.* v. *New Haven Redevelopment Agency,* 152 Conn. 137, 143, 204 A.2d 833 (1964) ; *DelVecchio* v. *New Haven Redevelopment Agency,* 147 Conn. 362, 364, 161 A.2d 190 (1960).

This reasoning applies with equal force to Benedict's projection that the property would be vacant and entirely unproductive for one year following the tenant's evacuation while the owner would be involved in soliciting and reviewing plans, engaging architects and contractors, and obtaining construction permits. In fact, renovation of the building began in June, 1975, approximately six months from the date the tenant evacuated the building.[7] The result was, again, that the projected cost of the transition to the highest and best use was increased and, as a consequence, so too was the depreciation

---

[7] Benedict's appraisal report was completed and delivered to the plaintiffs on February 3, 1976.

in market value of the property caused by the taking. This method of valuation, which builds a foundation for the appraisal of market value on hypothetical projections that are contrary to well-known facts, disserves the object of the constitution's "just compensation" mandate. Since the court's function is to award just compensation for the property taken, it is both unnecessary and misleading to rely upon "uncertain prophecy" instead of experience either to increase or to diminish a condemnation award. The report of Benedict was defective in this respect and the court erred in its reliance upon it. See *Bennett* v. *New Haven Redevelopment Agency,* 148 Conn. 513, 516, 172 A.2d 612 (1961).

## IV

We now turn to the defendant's final claim, that the court erred in concluding that the parking garage eventually constructed on land adjoining the plaintiffs' conferred no "special benefit" to the plaintiffs' remaining property. The finding in this regard is somewhat confusing. The court found that under the Stamford zoning regulations the plaintiffs' property was exempt from providing on-site parking for its office building because it was located within 500 feet of the new parking garage; that the plaintiffs, with partial occupancy of the building after conversion to office use, had no tenants that required parking; and that, in Benedict's opinion, adequate parking is necessary for office purposes and the presence of a parking garage immediately adjacent to the plaintiffs' property would enhance the desirability of offices in that location. Notwithstanding these facts, the referee concluded that the existence of the parking garage conferred no "special benefit" to "the plaintiffs" as distinguished from the general

benefit to the public at large. It is not altogether clear whether the referee based this conclusion on the theory that any benefit that inured to the plaintiffs' property was not unique to it, and hence, not a "special benefit," or on the fact that the plaintiffs, with the building partially occupied, had no use for parking facilities. Neither reason, however, provides justification for the conclusion. The test to be applied here is to what extent does the proposed or completed improvement undertaken by the condemnor affect the market value of the property not taken. In *Lefebvre v. Cox,* 129 Conn. 262, 265, 28 A.2d 5 (1942), we stated that under the rule governing an award of damages for property partially taken, a determination of the market value of the remainder should take "into consideration the changes contemplated in the improvement." See also *Heublein, Inc. v. Street Commissioners,* 109 Conn. 212, 215, 146 A. 20 (1929).

This is not a case where property has been taken by the state or a municipality, both of which have the additional power to tax and assess property owners who have been specially benefited by some public improvement. See, e.g., *Hanson v. Commissioner of Transportation,* 176 Conn. 391, 408 A.2d 8 (1979) (eminent domain action brought by state commissioner of transportation who exercises, under General Statutes § 13a-73 (b), the state's power to assess a property owner for special benefits conferred by public improvement). The defendant URC, while empowered to condemn, does not have the power to assess for special benefits. Compare General Statutes § 13a-73 (b) with § 8-129. Therefore, there is no need to distinguish here between special and general benefits, and we are not concerned with whether the benefit, if any there

may be, is denominated special or general. Nor is the test for measuring the benefit the extent to which the particular property owner benefits from the improvement. 27 Am. Jur. 2d, Eminent Domain § 368, p. 229; annot., 145 A.L.R. 81. The benefit is to be measured by the extent to which the market value of the property has been enhanced by the improvement. Therefore, we conclude that the referee should have taken into consideration the impact on fair market value that the public parking garage had on the after-taking market value of the plaintiffs' property.

There is error, the judgment is set aside and the case is remanded with direction to recommit it for the determination of damages in accordance with this opinion.

In this opinion the other judges concurred.