[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These are two companion appeals tried in succession from the assessment of damages by the defendant for the partial taking by eminent domain of two continuous parcels of land situated in the Town of Coventry for the relocation of Route U.S. 6. The first piece was owned by William Henry Hunt and Elfriede S. Hunt, formerly husband and wife, jointly, and the second piece was owned solely by William Henry Hunt.
"Pursuant to the provisions of [General Statutes] Section 13a-73(b) [and] (f)," the defendant on August 25, 1988, acquired from William CT Page 822 Henry Hunt and Elfriede S. Hunt, upon payment of damages in the amount of $58,600, 9.2 acres of their premises located on the southerly side of South Street and consisting of 13.8 acres. In addition, the defendant took temporary rights upon their remaining 4.6 acres to install a sedimentation control system 85 feet in length and to grade within an area of 0.01 of an acre during the highway construction. The premises taken are to be used for a Limited Access Designated Highway, Route U.S. 6, and highway access is being denied to and from the the owners' remaining land lying northeasterly of such highway. Although the condemnation included the westerly 73 feet of frontage along South Street, the remaining acreage retained by the owners continues to front 420 feet on South Street and 645 feet on Woodbridge Road. The plaintiffs have appealed from this assessment of damages in Docket No. 41831.
Under the same statutory authorities cited for the taking of the first piece, and upon payment of damages in the amount of $122,100, the defendant on November 10, 1988, acquired from William Henry Hunt the rear 14 acres of his property fronting on the west side of Woodbridge Road and bounded on the north by the first piece taken earlier, consisting of 18.7 acres. The portion condemned extended generally southerly to, and along the center line of, the Skungamaug River for 2,240 feet, thereby denying him access to, and all rights in, the river. Additionally, the defendant obtained the temporary right to install a barricade upon a portion of the owner's remaining land. These premises were also taken for the same limited access highway as the first piece, and access is being denied to and from the owner's remaining land lying northeasterly of the new highway. Access to Woodbridge Road from the remaining 4.7 acres will continue as before. The plaintiff has appealed from this assessment of damages in Docket No. 41539.
Plaintiff William Henry Hunt testified concerning his use of both properties in unity as a single commercial retail Christmas tree farm, including planting of the seed trees, their cultivation, harvest and sales. Formerly farmland, a small portion was devoted by him to the planting of corn. The remainder of the properties consisted of woodland. He also described the gravel service roadways, soil conditions, wetlands and streams which traversed the properties. Two bridges were located on the second parcel condemned.
The first piece was acquired by the Hunts on April 3, 1985. Christmas tree seedlings were planted soon thereafter. Since the time from planting to harvesting of a Christmas tree takes ten to twelve years, the first piece had not reached production at the time of the taking. About six or seven acres were planted with such seedlings and three acres were planted with corn. The remainder consisted of woodland. The sedimentation basin to be installed by the defendant will require that a loop road presently in the area be relocated.
Christmas trees were first planted on the second piece in 1963, and harvesting began ten years later. Approximately nine acres were devoted to the business at the time of condemnation. After the taking, only about three CT Page 823 acres of the tree farm remained. Because of the substantial reduction of acreage on both parcels devoted to the Christmas tree operation, the defendant's appraiser concedes "[i]t is reasonable to assume the Christmas tree farm use cannot exist after our taking."
In addition to the house and outbuildings and the land appurtenant to them, the second taking left Hunt with about one acre of wetlands and a stream that runs from a dry bed to two feet in depth and four feet in width. About three acres of the lower portion of the property taken is in the aquifer of the Skungamaug River. Total access to the Skungamaug River was taken from him by the condemnation of the second piece. This is a river that is stocked by the state for fishing. The taking included a small shed and the roadways that serviced the tree farm. A barricade was proposed to block the remaining roadway near the taking line.
As to Docket No. 41831, the subject property from which the first piece has been carved lies in a RU-40 Residential District Zone. Permitted uses are principally single and two-family residences, farms, schools and churches. The parcel is located in a rural area of Coventry. The neighborhood is comprised of numerous farms and single-family homes. The site is rolling and is serviced by all utilities including a well and septic system. It is irregular in shape. The portion taken, as well as the remainder, are also irregular in shape. The elevation of the proposed highway is significantly higher than that of the remaining land.
The appraisers for both the plaintiffs and the defendant are in agreement that even though there were no mature trees on this property at the time of the taking, the highest and best use of the property was its continued use as a Christmas tree farm in conformity with neighborhood needs and demands.
The partial taking of two-thirds of the acreage of 13.8 acres is a substantial loss in land area of the entirety. Coinciding with this loss in acreage is the additional loss of the Christmas tree farm. The loss of this land and business have materially damaged the plaintiffs.
Using the market data approach, the plaintiffs' appraiser estimated the value of the subject land in its entirety at $360,000. Broken down into its component parts, he found the value of a one-acre building lot to be $50,000, and the residential acreage of 12.8 acres at $24,000 to be $307,200, rounded to $310,000. In addition, he valued 8,000 Christmas tree saplings at $32,000, for a total value of the subject property before the taking rounded to $390,000.
The after-taking value was computed in like fashion. The one-acre building lot was valued at $50,000. The remaining residential acreage of 3.6 acres was valued at $86,400, for a rounded total value of $140,000. Based on these valuations he found the damages to the plaintiffs caused by the first taking to be $250,000. CT Page 824
The damages assessed by the defendant for the first taking were predicated upon the appraisal report prepared for him on April 12, 1988, four and one-half months before the taking. The before taking value was then computed as follows: 13.8 acres at $5,500 per acre = $75,900; contributory value of 8,000 seedlings = $8,000; total value = $83,900. The remaining 4.6 acres were valued at $5,500 per acre for a total value after taking of $25,300. Accordingly, by that appraisal damages to the plaintiffs were found to be $58,600. That assessment of damages was made at the taking on August 25, 1988.
On March 6, 1989, the defendant's appraiser updated her report to August 25, 1988, the date of taking. Based on more recent comparable sales and the increased contributory value of the seedlings because of their continued growth, the appraiser increased the plaintiffs' damages 62.12% to $95,000 by the following computation:
 Before: 13.8 acres x $9,000 per acre = $124,200 Contributory value of 8,000 seedlings = 12,000 -------- $136,200 After: 4.6 acres x $9,000 per acre = 41,400 -------- $94,800 or Total damages = $95,000
As to Docket No. 41539, the subject property from which the second piece was condemned by the defendant lies partly in a RU-40 Residential Zone and partly in a RAZ River Aquifer Zone, the latter zone being basically a two-acre zone and more restrictive than RU-40, a one-acre zone. The characteristics of site, shape, grade and elevation are similar to those of the first piece. The residential portion of this property has not been affected by the taking.
The appraisers for both parties are in agreement that the highest and best use of the property was a continuation of its present use as a single family dwelling and Christmas tree farm. For appraisal purposes the property was broken down into a one-acre house lot and 17.7 acres of land containing a Christmas tree farm.
The partial taking of three-quarters of the acreage of 18.7 acres is a substantial loss in land area of the entirety. Coinciding with this loss in acreage is the additional loss of the Christmas tree farm. Furthermore, by the defendant's taking of the rear 14 acres, the plaintiff lost all access to the Skungamaug River, a state-stocked stream, as well as his ownership and riparian rights to its center line along its entire border with the plaintiff's property of 2,240 feet, a distance in excess of 0.42 of a mile along its meandering course. The loss of substantial acreage of his land, the liquidation of the prosperous Christmas tree operation, the denial of the riverfront and the taking of appurtenant riparian rights with ation of the property have greatly damaged the plaintiff. CT Page 825 plaintiff's appraiser in this instance again utilized the market ach. Using the same component values of $50,000 for a one-acre lot, $24,000 for each acre of the acreage of 17.7 acres, and $4 of 10,000 saplings, he estimated the fair market value of the property before the taking to be $520,000, plus an "X" value for the elements not involved in the proceeding. In like fashion, he valued remaining after the taking at $150,000 in round numbers. Based valuations, he found the damages to the plaintiff caused by the taking to be $370,000 ching her conclusions as to fair market value of the subject he defendant's appraiser used the market data approach only for lot of one acre. On the basis of sales of residential lots of size, the fair market value of the plaintiff's lot was $60,000. Some approach was used to determine the fair market value of the 17.7 acres because there were no comparable sales of ee farms available. By a group count, there were 10,000 trees sizes on the property. It was estimated that they would mature ar period, which equates to 1,000 trees per year. A 5% loss was due to disease and other causes. The current price was $18.50 per less of size or shape. A 10% discount rate was used with a 2.5% annual increase in the price of trees. The income from the sale of his period was calculated to be $112,900. A reversion value of estimated at the end of the 10 year life of the Christmas tree as discounted at 10%, giving a present worth of $9,200. The tree income and land reversion combined determined her valuation of 17.7 acres by income capitalization to be $122,100. By these calculations, the defendant's appraiser found the fair market value of the entire property before the taking to be $182,100.
After the taking of 14 acres at the rear of the plaintiff's land, the remaining property consisted of a single-family dwelling on 4.7 acres having a frontage of 403 feet on Woodbridge Road. The Christmas tree farm no longer existed as the defendant had taken most of the trees and the remaining acreage was insufficient for such an operation. The highest and best use of the land was for a single-family dwelling on an oversized lot. Using comparable sales of residential lots ranging from 3.205 acres to 6.28 acres in size, the defendant's appraiser valued the land consisting of 4.7 acres after the taking at $60,000. Since the house was not affected by the condemnation, it was not valued in either the before or after valuation. The total damages were calculated to be $122,100. This was the amount assessed and paid by the defendant. The defendant's appraisal was prepared on June 13, 1988, five months before the taking.
Neither the plaintiff's appraiser nor the defendant's appraiser valued the "right to install a barricade upon a portion of (the plaintiff's) remaining land within an area located between and opposite approximate Stations 1074+25 and 1074+43 left, Westbound Center Line Route U.S. 6, as more particularly shown on Sheet 1 of (the taking) map." Since "[s]aid right shall terminate automatically upon completion of the work by the State," it was determined by the appraisers that the right was temporary and of no CT Page 826 consequence to the plaintiff.
A careful reading of the certificate of taking discloses that by its terms the "right to install" the barricade upon the plaintiff's remaining land is temporary, but not the barricade itself after its erection. The language used denotes a permanent barricade, and not a temporary one. This is confirmed by the taking map referred to in the description of the right. The map depicts a barrier across the plaintiff's remaining roadway near the taking line which is identified as "Prop. Barricade." In addition, the map recites: "Right To Install Barricade Acquired." Neither the barricade described in the certificate of taking, nor the barricade shown and described on the taking map, is identified as a "temporary barricade" to be maintained only until the "completion of the work by the State" in the construction of the new highway. The appraisers erred in not including the permanent barricade in their description of the taking and in not assessing any damages resulting therefrom.
It is a basic requirement in eminent domain proceedings that the property to be condemned and all accompanying rights, easements and interests, whether temporary or permanent, be described with reasonable certainty. The condemnation of property affects the title to real estate. What is taken in eminent domain is determined by the certificate of taking and judgment upon any appeal from the assessment of damages therein. Title is a very important aspect of the ownership of property. Therefore, documents pertaining thereto must be correct and definite in terms before their recordation for present and future purposes.
The owner is entitled to know with exact certainty what the condemning authority seeks to appropriate from his ownership of the property. Such accuracy is essential for the protection of the rights of the parties, as well as of the public for whose use the condemnation has been undertaken. Any uncertainty in the description or in the degree of interest to be acquired will render the proceeding null and void, or if undetected, may result in an injustice or future corrective litigation. The certificate of taking and "taking map" referred to or annexed thereto must definitely identify the property and all rights, easements and interests taken, and leave no room for doubt or conjecture. See A.D. Jahr, Law of Eminent Domain, section 225. "The fact that the description is incomplete or unintelligible without consultation with a map or plan is not objectionable if the map is referred to in the description and is filed with it, and, taken together, the map and the description make clear what property is intended to be included in the taking." 6 Nichols', The Law of Eminent Domain, (Rev.3d Ed.), Section 26.112, pp. 26-72 — 26-73.
The plaintiff showed great concern in his loss of access to the Skungamaug River resulting from the defendant's condemnation of his rear 14 acres to the center line of the river for a distance of 2240 feet, or more than 0.42 of a mile, along the course of the meandering river. Coincident to this taking, in addition to the barring of access to the river, was the loss of his ownership to midstream and riparian rights in the river along the CT Page 827 boundary of his condemned property. The Skungamaug River is a state-stocked stream that was available to him privately along his border for fishing and other recreational activities. This consequential damage from the defendant's condemnation was not considered in the determination by the appraisers of the fair market value of the subject property before and after the taking and the resulting damages.
In determining whether a taking of the property of a riparian proprietor in the constitutional sense has been effected by an interference with his rights in the water or in the bed of the stream under legislative authority, the first step is to determine what his rights are. Riparian rights are property which cannot be taken except for the public use and upon payment of just compensation. 4 Nichols', The Law of Eminent Domain (Rev.3d Ed.), Section 5.29, p. 5-368. "Such rights, however, to be compensable, must be rights which are accorded to an individual only by virtue of the fact that he is a riparian proprietor." Id., 5-373. When the watercourse lies within the lands of more than one proprietor, each has certain rights in the whole stream by virtue of his ownership of the shore or bank, and the sum of these rights constitutes the ownership of the whole stream. Id., 368.
After viewing the river on its inspection of the subject property, the court takes judicial notice that the Skungamaug River along the border of the plaintiff's property is a non-navigable waterway. In non-navigable streams, each riparian proprietor owns to the middle of the river, and has important private rights in the waters. See id., section 5.30[1]. The Certificate of Taking of the plaintiff's 14 acres to mid-stream of the Skungamaug River is confirmatory of his ownership to the middle of the river. As a riparian owner, the plaintiff had private rights in the waters of the Skungamaug River which were expressly important to him.
The riparian owner upon a private non-navigable watercourse has a constitutional right to erect structures in the bed or make any use of the waters that does not interfere with the private riparian rights of the other proprietors. Id., Section 5.31, p. 5-384 and n. 4. "The exclusive right to take fish in private non-navigable watercourses is in the riparian owner, and this right is a property right in the constitutional sense, but the fish are not property until actually caught. The riparian proprietors have no right to obstruct the free passage of fish . . . . The public authorities may stock the water with fish without the consent of the riparian owners." Id., 5.36, pp. 5-435 — 5-438. Other rights that may exist are the use of the waters for bathing and for the enjoyment of prospect, that is, a scenic view, light and air. See, id., p. 5-434.
The plaintiff's ownership of the condemned property to the midstream of the Skungamaug River gave him these private riparian rights to the watercourse. These riparian rights were "incident to such ownership, passing with the transfer of the land, although not designated as such in the conveyance. Title thereto may not be taken without compensation." Id., Section 5.29, p. 5-367, n. 4, quoting In the Matter of City of New York, CT Page 828240 N.Y. 68, 147 N.E. 361.
Both appraisers were of the same opinion that there was no severance damage to the remaining 4.7 acres of the second parcel due to the taking by the defendant of the rear 14 acres to the mid-stream of the Skungamaug River. In this conclusion they erred.
"We have consistently departed from the fair market value measure of damages in cases of partial takings. When only a portion of a party's property is taken, the landowner is entitled not only to compensation for the value of the property taken, but also to severance damages for the diminution in the value of the landowner's remaining property that the severance of a portion of the property causes. D'Addario v. Commissioner of Transportation, 180 Conn. 355, 363, 429 A.2d 890 (1980); Tandet v. Urban Redevelopment Commission, 179 Conn. 293, 298, 426 A.2d 280 (1979); 7A P. Nichols, Eminent Domain (3 Ed. 1990) Section 12.02(1), p. 12-2. To ensure that severance damages are included in the trial court's assessment, damages should be calculated by the `before and after rule,' under which `[t]he proper measure of damages is the difference between the market value of "the whole tract" as it lay before the taking and the market value of what remained of it thereafter.' Northeastern Gas Transmission Co. v. Ehrhorn,145 Conn. 83, 86, 139 A.2d 53 (1958); Laurel, Inc. v. Commissioner of Transportation, 180 Conn. 11, 36, 428 A.2d 789 (1980); Meriden v. Ives,165 Conn. 768, 770, 345 A.2d 13 (1974)." Alemany v. Commissioner of Transportation, 215 Conn. 437, 444-45 (1990). In essence, the measure of the access right lost to the plaintiff's remaining property of 4.7 acres as severance damages is the difference in the market value of the property, that is, the entire bundle of rights, immediately before the taking and the market value immediately after.
"Access to a stream is a property right which cannot be taken without compensation. . . . . At the time of the condemnation the plaintiffs had access to the Hockanum River from all parts of the `Fanning' property. Once the parkway is built, there will be no access to the river from that portion of the `Fanning' property lying north of the parkway. This is a property right and cannot be taken without compensation. There may be much or little to the plaintiffs' claim that this right is of great value. That simply affects the amount of compensation to which the plaintiffs are entitled and does not alter the fact that the defendant is now taking the right without paying anything for it." William J. Thornton v. William J. Cox,14 Conn. Sup. 140, 143 (1946). Access to the river enhanced the value of the plaintiff's property as a whole. Its loss detracts from or diminishes the value of the plaintiff's remaining property of 4.7 acres northeasterly of the 14 acres taken by eminent domain to the mid-stream of the Skungamaug River.
By using replacement cost of the Christmas trees, taken the plaintiffs' appraiser did not utilize the proper measure of damages for their loss. The value of such plant growth upon land taken by eminent domain may be considered insofar as the existence of such growth has a bearing upon the CT Page 829 enhancement in market value of such land. Conversely, the rule has been stated that such growth cannot be separately evaluated independently of the value of the land. 4 Nichols', The Law of Eminent Domain (Rev.3d Ed.), Section 13.21, pp. 13-106 — 13-109.
Both condemnations were taken under the provisions of General Statutes Sections 13a-73(b) and (f). Section 13a-73(b) is the fundamental law providing for the condemnation of land for highway purposes. As relevant here, Section 13a-73(f) provides as follows: "The commissioner may take or purchase rights of access to and egress from land abutting any highway or land taken or purchased as right-of-way therefor . . . when in his judgment such limitation of access is necessary to permit the convenient, safe and expeditious flow of traffic. Such taking or purchase shall be in the same manner and with like powers as authorized and exercised by said commissioner in taking or purchasing real property for state highway purposes." (Emphasis added.)
The reason for the defendant's dependence upon Section 13a-73(f) in these proceedings is not clear. Pursuant to Section 13a-59, 1963 Supplement to the General Statutes (now General Statutes Section13b-27), on December 20, 1965, the relocation of Route U.S. 6 was designated "as a limited access highway to allow access thereto only at designated points." Both takings were made expressly "to be used for a Limited Access Designated Highway, Route U.S. 6." Each taking map specifies "Rights Of Access Denied."
"Where a limited-access road is constructed where no such road existed before, the landowner cannot recover damages by reason of lack of access to such new road, because no such right existed before." 10 Nichols', The Law of Eminent Domain, Section 10.2211[4]. "The certificate of taking states that the land was taken for . . . a limited access highway. There are no abutter's rights to a limited access highway. South Meadows Realty Corporation v. State, 144 Conn. 289, 294, 130 A.2d 290 (1957)." Laurel, Inc. v. Commissioner of Transportation, 180 Conn. 11, 28 (1980).
In Docket No. 41831, the plaintiffs' remaining property continues to front 420 feet on South Street and 645 feet on Woodbridge Road. No rear highway access existed before the taking for the new limited access highway. The plaintiffs are not entitled to any compensation for non-access since no property rights have been taken. In Docket No. 41539, the plaintiff's remaining property continues to front 403 feet on Woodbridge Road. No rear highway access existed before the taking. The plaintiff is not entitled to any compensation for non-access since no property rights have been taken.
The defendant's reference in both takings to his authority under Section 13a-73(f) is not only inapplicable, but also misleading and confusing. The specification in both the certificates of condemnation and the referenced maps that the purpose of the takings was for a limited access highway and that access rights were being denied was adequate notice in the circumstances surrounding these proceedings that the plaintiffs were not entitled to any compensation for the denial of access to the new highway. CT Page 830
A state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is an arbiter charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v. Commissioner of Transportation, 211 Conn. 383, 388 (1989); Birnbaum v. Ives, 163 Conn. 12, 21-22 (1972); Feigenbaum v. Waterbury,20 Conn. App. 148, 153 (1989). It is his task to reach a result that gives the plaintiff, as nearly as possible, a fair equivalent in money as just compensation for the property taken. Mathis v. Redevelopment Agency,165 Conn. 622, 623 (1973); Feigenbaum v. Waterbury, supra, 153-54.
It is the conclusion of the court that in both cases, Dockets Nos. 41831 and 41539, the market data approach is the most appropriate methodology for estimating the market values of the subject properties before and after the takings.
After viewing the site of the subject property in Docket No. 41831, and after giving due consideration to the opinions of the expert witnesses and to my knowledge of the elements that establish value, I find that the before taking value of the subject property was $300,000, and that the after taking value was $114,000. Damages, therefore, are assessed at $186,000.
In Docket No. 41831, judgment may enter for the plaintiffs in the amount of $186,000, less $58,600, or an excess of $127,400, with interest from the date of taking to the date of payment, together with costs, and a reasonable appraisal fee of $1200.
After viewing the site of the subject property in Docket No. 41539, and after giving due consideration to the opinions of the expert witnesses and to my knowledge of the elements that establish value, I find that the before taking value of the subject property was $504,000, and that the after taking value was $110,000. Damages, therefore, are assessed at $394,000.
In Docket No. 41539, judgment may enter for the plaintiff in the amount of $394,000, less $122,100, or an excess of $271,900, with interest from the date of taking to the date of payment, together with costs, and a reasonable appraisal fee of $1200.
WILLIAM C. BIELUCH STATE TRIAL REFEREE