[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I STATEMENT OF THE CASE
The plaintiff, Tilcon Minerals, Inc., has applied for a reassessment of damages in connection with the condemnation of certain property by the defendant Commissioner of Transportation. The defendant condemned a portion of the plaintiff's property in Plainfield pursuant to General Statutes § 13a-73 (b), for the purpose of widening a portion of Interstate 395. The plaintiff's application for reassessment was filed pursuant to General Statutes § 13a-76.[1]
 II PROCEDURAL HISTORY CT Page 13257
The defendant filed with the clerk of the Superior Court a notice of condemnation and assessment of damages on June 26, 1998. The defendant assessed damages in the amount of $50,000, and has deposited that amount with the court. The plaintiff timely filed its application for reassessment on November 13, 1998. The hearing on the matter was held on May 23 and May 25, 2000. The parties filed post-trial briefs on July 13, 2000. The referee has also viewed the property as required by General Siaiutes § 13a-76.
 III FACTS
The plaintiff owns several parcels of land in Plainfield totaling approximately 1,000 acres. The plaintiff runs a mining and processing operation on the property. Sand, gravel and stone are mined at various locations on the property, and are then sent to a processing plant, also located on the premises, where they are processed into specification materials, such as asphalt, concrete, and construction aggregate, for use in the construction industry. A number or public roads run through the property, including Green Hollow Road, which runs in a northerly/southerly direction through the middle of the property.
The particular portion of the property that is the subject of the present case is zoned for industrial use, and located to the east of Green Hollow Road (the eastern parcel). The plaintiff's processing facilities are located to the west of Green Hollow Road. Although there are currently no mining operations on the eastern parcel, the plaintiff plans to mine the area in the future. Before the taking, the eastern parcel contained approximately 190.3 acres and was bounded on the north by the Killingly town line, on the east by Interstate 395, and on the south by Roper Road. The northern portion of the western boundary line abutted Green Hollow Road, while most of the southern portion of the western boundary abutted various property not owned by the plaintiff. The parties stipulated that the date of the taking was June 26, 1998 and that the condemned property consists of 19.9 acres from the center of the eastern parcel. The taking has divided the eastern parcel roughly CT Page 13258 in half, and the southern portion (the future mining area) is now completely cut off from the northern portion. The property remaining after the taking consists of 170.4 acres.
Because the plaintiff's processing facilities are located in the western portion of its property, any raw materials mined in the future mining area must be transported to the other side of Green Hollow Road in order to be processed. In the past, when certain areas of the eastern parcel were mined, the mined materials were transported west by way of a tunnel running under Green Hollow Road. The tunnel is located in the northern portion of the eastern parcel, and the taking has cut off access from the future mining area to the tunnel.
The plaintiff claims that the $50,000 paid by the defendant for the 19.9 acres is inadequate for two main reasons. First, the plaintiff claims that the market value of the 19.9 acres taken by the defendant is greater than $50,000. Second, the plaintiff claims that the value of the remaining land has been diminished by the loss of the 19.9 acres, because the inability to use the tunnel will require the plaintiff to incur additional costs in transporting raw materials to the processing facility. The plaintiff argues, therefore, that it is entitled to severance damages. Additional facts are set forth below as necessary.
 IV JURISDICTION
Under General Statutes § 13a-76, an application for reassessment of damages may only be brought by one who is aggrieved by the defendant's assessment. "[T]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision. . . CT Page 13259 . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citation omitted; internal quotation marks omitted.) Med-Trans of Connecticut, Inc. v. Dept. ofPublic Health Addiction Services, 242 Conn. 152,158-59, 699 A.2d 142 (1997).
In the present case, it is undisputed that the plaintiff was the owner of the land condemned by the defendant. The plaintiff therefore has the requisite personal and legal interest to satisfy the first requirement of aggrievement. Furthermore, if the damages paid by the defendant are inadequate, the plaintiff's legally protected interest in being adequately compensated for its property has. been adversely affected. The second requirement for aggrievement is therefore also satisfied. Consequently, the plaintiff has standing to bring this action pursuant to § 13a-76.
 V STANDARD OF REVIEW
"Under our law, a state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of [the Supreme Court] with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. He is not limited by the estimate of value reached by the taking authority." Birnbaum v. Ives,163 Conn. 12, 21-22, 301 A.2d 262 (1972); see alsoMinicucci v. Commissioner of Transportation, 211 Conn. 382,388, 559 A.2d 216 (1989).
 VI DISCUSSION
"The function of the trial court in condemnation cases is to determine as nearly as possible the fair equivalent in money for the property taken. . . . Although the market value of the taken property is CT Page 13260 ordinarily the most appropriate measure of fair compensation . . . we have long held that other measures may be appropriate when the fair market value measure of damages does not fully compensate the owner. . . . [T]he question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily by just compensation as he would have been in had the property not been taken." (Citations omitted; internal quotation marks omitted.)Alemany v. Commissioner of Transportation, 215 Conn. 437,444, 576 A.2d 503 (1990).
The Supreme Court has "consistently departed from the fair market value measure of damages in cases of partial takings When only a portion of a party's property is taken, the landowner is entitled not only to compensation for the value of the property taken, but also to severance damages for "the diminution in the value of the landowner's remaining property that the severance of a portion of the property causes. . To ensure that severance damages are included in the trial court's assessment, damages should be calculated by the "before and after rule,' under which [t]he proper measure of damages IS the difference between the market value of the whole tract as it lay before the taking and the market value of what remained of it thereafter." (Citations omitted; internal quotation marks omitted.) Id., 444-45. "The `fair market value' is the price that the trier reasonably thinks would result from fair negotiations between a willing seller and a willing buyer. The valuation should ordinarily be based on the `highest and best' possible use of the land." (Internal quotation marks omitted.) Laurel, Inc. v. Commissionerof Transportation, 180 Conn. 11, 37, 428 A.2d 789
(1980).
 A Highest and Best Use and Fair Market Value
The plaintiff argues that the $50,000 damages assessed by the defendant are inadequate, and that the figure was based on an incorrect conclusion that the highest and best use of the eastern parcel is for residential purposes. The defendant's assessment was based on the CT Page 13261 appraisal of Michael Aletta, who testified that he relied on the representations of Frank Lane, Tilcon's director of real estate, in determining the highest and best use of the property. According to Aletta, Lane made reference, during a conversation, to the possibility of residential development in the future. In addition, Aletta stated in his appraisal report and his testimony that the Town Planner's Office in Plainfield informed him that a zoning change from industrial to residential would probably be granted if requested. On the basis of these conversations, Aletta assumed that the property would be developed residentially, and appraised it as raw residential property. As a result, Aletta concluded that the eastern parcel is worth $2,500 per acre.
The plaintiff has submitted in evidence a real estate appraisal conducted by Robert F. Mulready, who also testified at trial. Mulready found that the highest and best use of the eastern parcel is for mining sand, gravel and rock. Mulready's conclusion was supported by the evidence presented by the plaintiff, showing that the eastern parcel is appropriate for future mining operations. Gary Wall, who works for the plaintiff as manager of its quarry divisions, testified regarding five test digs conducted on the property. According to Wall, the test pits, which were approximately eight to ten feet deep and three feet wide, revealed that the property contained very high quality rock, suitable for processing and blending at Tilcon's processing plant.
In calculating the fair market value of the eastern parcel, Mulready relied primarily on the sales comparison approach, in which the appraiser examines actual sales of similar property in order to determine the fair market value. Mulready included the sales of six properties, with ranging from $11,549 per acre for highly productive mining property to $3,000 per acre for certain property that was inappropriate for either mining or residential use. Mulready concluded that the eastern parcel, at the time of the taking in the present case, was inferior to four of the properties, and superior to two. He therefore concluded that the eastern parcel had a fair market value of $6,700 per acre at the time of the taking.
Aletta admitted that had he been aware that the CT Page 13262 property contained usable materials for future mining, he would have changed his methodology, and might have increased his estimate of the value of the land. Aletta also admitted that he did not include industrial properties in his sales comparisons, despite the fact that the property is zoned for industrial use and that an appraisal should normally give consideration to the zoning of property.
The defendant argues, however, that the plaintiff should be estopped from asserting that the property is industrial because Aletta's appraisal of the property as residential was the result of the representations of an employee of the plaintiff. Specifically, Aletta claims that Frank Lane represented to him that "there was some thought as to residential development on the subject parcel . . . ." The court finds it difficult to see why an experienced real estate appraiser would rely on such noncommital and vague statements in determining a property's highest and best use. Furthermore, as stated above, the court must arrive at its own independent determination of the value of the taken property, rather than simply relying on the statements of witnesses. This goal would certainly not be served by invoking the doctrine of estoppel under these circumstances.
Based upon all of this evidence, the court concludes that the highest and best use of the land is for mining purposes and that it was worth $6,700 per acre at the time of the taking, not including severance damages.
 B Severance Damages
The defendant's $50,000 assessment did not include any severance damages. As indicated above, however, our Supreme Court has held that when there has been a partial taking, as in the present case, the landowner is entitled to damages for a diminution of the value of the remaining land, and the aim of this court should be to put the plaintiff in as good a position as it would have been had the property not been taken. See Alemany v.Commissioner of Transportation, supra, 215 Conn. 444-45.
The taking in this case cut off access from the future CT Page 13263 mining area to the tunnel in the northern area. The plaintiff's claim regarding severance damages is that the loss to access to the tunnel will force the plaintiff to use more costly methods of transporting materials to the processing plant to the west. Gary Wall testified that the tunnel was built to accommodate the large hauling trucks that the plaintiff uses to transport raw materials from the mining areas to the processing plant. These trucks, known as Euclids, are built specifically for use in quarries and on rugged terrain, and are too large for regular road use. The tunnel, although not presently in use, was used by the plaintiff in the past and is large enough for a Euclid to pass through.
Wall testified further that the plaintiff tracks in detail the cost of operating its fleet of Euclid trucks including fuel, labor, maintenance and other expenses, and that the cost comes to $.61 per ton of material hauled. He testified that as a result of losing access to the tunnel, the plaintiff will have to hire smaller road-worthy triaxle dump trucks at a rate of $52 per hour. The triaxle trucks could haul three loads of twenty tons each hour, with a resulting cost of $.87 cents per ton. The cost of hauling materials with the triaxle trucks is therefore $.26 cents higher per ton than using the Euclids.
Mulready, the plaintiff's appraiser, calculated that the future mining area could be expected to yield 1,122,916 tons of usable material over a period of fifteen years. Applying to this amount the $.26 per ton increase of using the smaller triaxle trucks rather than the large Euclids, the total loss comes to $291,958. Mulready then discounted this amount over fifteen years at a rate of ten percent to produce a present value of $174,000 in severance damages. Applying this number and the $6,700 per acre value as discussed above, the fair market value of the eastern parcel after taking can be calculated as follows:
$1,141,680 (170.4 acres * $6,700 per acre)
- $174,000 (Severance damages)
$967,680 (Value after taking) CT Page 13264
Applying the "before and after rule" discussed above, the total damages can be calculated as follows:
$1,275,010 (190.3 acres * $6,700 per acre)
- $967,680 (Value after taking)
$307,330 (Total damages)
The defendant, in its post-trial brief, makes a number of attacks on these calculations and the facts supporting them. The court will address each of the defendant's arguments in turn. First, the defendant argues that the plaintiff or a subsequent purchaser of the property would not need to hire triaxle dump trucks in order to transport materials to the processing plant, because the larger Euclid trucks could still be used. According to the defendant's arguments, although Euclid trucks are ordinarily not permitted to drive on public roads, the plaintiff could obtain an industrial permit that would allow the plaintiff's Euclids to cross over public roads. The evidence, however, demonstrated that this is not a feasible alternative. Rudolph Kamm, Supervisor of the oversized/overweight permit section of the Connecticut department of transportation, testified that in order for the Euclids to cross the public roads in Plainfield, the road would have to be physically closed to other traffic. Furthermore, Kamm's testimony, as well as the topographic maps admitted in evidence, establish that there are only two locations where trucks could cross Green Hollow Road from the future mining area, and that the terrain in those areas would be difficult if not impossible for the Euclid trucks to negotiate, because of both the steepness of the terrain and the presence of ponds on the property. Crossing the road with Euclid trucks therefore does not appear to be a realistic alternative to renting triaxle trucks.
Second, the defendant argues that there is no need for the plaintiff to truck raw materials from the future mining area because the processing equipment used by the plaintiff is portable, and could be moved to the mining area. Gary Wall testified, however, that the portable components are not capable of doing all of the processing and that the material would still have to be transported to the facilities west of CT Page 13265 Green Hollow Road for further processing. Furthermore, Frank Lane's testimony and the maps in evidence establish that the processing plant west of Green Hollow Road is supported by an infrastructure including a settlement basin for water and an area for loading products onto the Providence and Worcester Railroad. Moving some components of the processing equipment to the mining area would therefore not alleviate the need to transport materials to the facilities west of Green Hollow Road.
Third, the defendant argues that materials mined in the future area could be sold as unprocessed gravel, thus eliminating the need to transport them to the processing facilities. The evidence does not support the defendant's argument. Although Wall testified that there is a strong market for unprocessed gravel in Connecticut, he also testified that unprocessed gravel accounts for less than five percent of the plaintiff's business and that the materials in the future mining area would have to go through some type of processing to be usable. The defendant offered no other evidence that the materials in the future mining area would be appropriate for use as unprocessed gravel. Because the materials in the future mining area would need to be processed, a prospective buyer of the property would consider the additional post-taking costs of transporting the materials, thus reducing the property's market value.
Fourth, the defendant argues that the plaintiff has failed to show that it has legal access to the tunnel under Green Hollow Road, and that it is therefore not clear that the plaintiff has been harmed by losing access to the tunnel. Gary Wall's uncontradicted testimony, however, established that the tunnel was previously used by the plaintiff to haul materials under the road. Furthermore, no testimony or other evidence was presented showing that the plaintiff had ever been prevented from using the tunnel or that the plaintiff does not have a legal right to pass through the tunnel. Absent any concrete evidence, the defendant's assertion that the plaintiff does not have legal access to the tunnel is entirely speculative.
Fifth, the defendant claims that the plaintiff's claim for severance damages should be rejected because of CT Page 13266 contradictory testimony regarding triaxle dump trucks. The defendant asserts in its post-trial brief that the plaintiff's witnesses could not agree on the materials from which triaxle trucks are made, and on whether such trucks could be used to haul gravel to the processing plant. Contrary to the defendant's assertions, the witnesses did agree that some triaxle trucks are made from steel while others are made from aluminum. Furthermore, the witnesses did not contradict each other regarding whether triaxle trucks could haul gravel. The plaintiff's witnesses on the subject agreed that without access to the tunnel, the plaintiff would have to hire triaxle trucks to transport gravel to the processing plant. Joey Ellis, the plaintiff's equipment manager, further testified that hauling unfinished products over rough terrain would result in extreme wear on the triaxle trucks and that an aluminum triaxle used for such purposes would be "junk" within one year as a result. In fact, one of the defendant's own witnesses confirmed this conclusion. Rudolph Kamm, who is supervisor of the oversized/overweight permit section of the Connecticut Department of Transportation testified that triaxles "take quite a beating" when used to haul sharp rock and quarry stone, and that there is no comparing the triaxles and the large off-road Euclid trucks. Far from compelling a conclusion that the plaintiffs are not entitled to severance damages, all of this testimony actually confirms the plaintiff's position that hauling these materials will be extremely costly.
Sixth, the defendant, in its post-trial brief, renews its objection, made at trial, to the admission of evidence of the five test pits dug by the plaintiffs in the future mining area. The defendant argues that under the holding in Tandet v. Urban RedevelopmentCommission, 179 Conn. 293, 310, 426 A.2d 280 (1979), the court may not consider evidence of the test digs, because they were performed after the date of the taking. In Tandet, the Supreme Court held that a trial court, in calculating the market value of the property remaining after a partial taking, should not rely solely on projections of value made before or at the time of the taking, if the actual facts as they developed after the taking reveal a different market value. See Tandetv. Urban Redevelopment Commission, supra, 179 Conn. 306-307. CT Page 13267 The case is entirely irrelevant to the issue of whether the court may consider tests conducted after the date of the taking, when the tests are probative of the condition of the land at the time of the taking. Furthermore, it is highly unlikely that the geological makeup of the property changed between the date of the taking in 1998 and the date of the tests in 2000. The court therefore will not reconsider its overruling of the defendant's objection.
With regard to the test pits, the defendant also argues that the court should not rely on the evidence because the tests were inconclusive. As indicated above, however, Gary Wall testified that the test pits revealed that the future mining area contains material suitable for mining and processing by the plaintiff. The defendant offered the testimony of Leo Fontaine, a principal engineer with the state Department of Transportation. Fontaine testified that simply digging a few test pits was insufficient to make a determination of the suitability of the material. Nevertheless, neither Fontaine himself, nor any of the defendant's other witnesses, did any testing themselves to determine whether the material in the future mining area was suitable. Fontaine testified that he merely picked up some soil and squeezed it in his hand, and that he did not do any more extensive testing because of money and time limitations. He also testified that he would have liked to have tested the property because it would have been helpful in preparing his testimony.
Fontaine also testified that his office did a detailed survey of the entire state in the 1960s and that the survey revealed that the general area around the plaintiff's property consisted of materials deposited by glaciers. According to Fontaine, such materials are inappropriate for the plaintiff's use because they contain large quantities of fines, or small particles that must be washed away. The court is not persuaded by this evidence, in light of the testimony of Wall, based on actual digs conducted in the future mining area itself. Furthermore, the plaintiff's successful mining operations on the property adjacent to the future mining area cast doubt upon the reliability of the 1960s survey and Fontaine's conclusions drawn from it. Because the defendant did not offer any evidence of testing to CT Page 13268 contradict Wall's conclusion, which was based on firsthand knowledge of the material found in the test pits, the court is persuaded that the future mining area contains materials appropriate for the plaintiff's use.
Finally, the defendant claims that the plaintiff's calculation of severance damages is flawed in that it did not account for the presence of wetlands in the area between the future mining area and the tunnel. The testimony and other evidence shows that the presence of these wetlands would have required the plaintiff to obtain a wetlands permit to haul materials to the tunnel. The plaintiff presented the testimony of Clinton Webb, an environmental consultant who served as a wetlands specialist for the Environmental Protection Agency for seven years. Webb also served as a member of the Brooklyn inland wetlands commission for approximately three years, and as a former town manager of Plainfield, in which capacity he had experience with wetlands matters. Webb testified that under the pre-taking circumstances in the present case, approval of an application for a wetlands permit would have been highly probable. The court therefore agrees with the conclusion of the plaintiff's appraiser that such a permit would have been granted.
 VII CONCLUSION
The plaintiff is entitled to the difference between the value of its property before the taking and the value of the remaining property after the taking. The value of the property before taking was $1,275,010. The value of the property, after the taking of the 19.9 acres and the subtraction of severance damages, was $967,680. The plaintiff's damages are therefore found to be $307,330. The court will not award appraisal fees, as no evidence has been submitted to support such an award. The defendant has already deposited $50,000 with the court, and judgment is hereby entered for the plaintiff in the additional amount of $257,330.
 D. Michael Hurley Judge Trial Referee