[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
The appellant Thomas Murphy in this matter asked for a review of the statement of compensation filed on April 25, 1991 by the appellee, Town of Waterford, a municipal corporation, in the full taking of his real property in fee at 618 Mohegan Avenue Parkway in Waterford, Review of this statement of compensation which is in the amount of $35,000. is sought under General Statutes 48-12
and 128 et seq. The plaintiff contends that that amount is inadequate. The Town denies that Murphy is aggrieved as claimed CT Page 6530 by the statement of compensation in that amount. This matter was referred to the undersigned State Trial Referee. Thereafter, a hearing was held at which the parties adduced evidence, both oral and by exhibits. After the hearing this court viewed the subject property in the presence of counsel for the parties.
The subject property contains 0.64 acres, more or less, and, when condemned, had situated on it a building that was once used in connection with the former use of this property as a gasoline station. The site is a corner lot with a frontage of about 120 feet on Burlake Road (which runs in a generally easterly and westerly direction) and frontage of about 232 feet on Mohegan Avenue Parkway (which runs in a generally northerly and southerly direction). The rear or southerly bound is about 120 feet long. The westerly bound is about 242 feet long. Generally speaking, the easterly portion of the lot is level and at street grade. The westerly portion of the lot, however, for almost one-half its length is characterized by vertical ledge. Overall this site encompasses an area of approximately 28,320 square feet. This property is adjacent to Route #32, the major road from New London to Norwich and it has access to Interstate 395 north of the subject property. Traffic on Route #32 in this area is heavy. There are residential uses in the area of the subject which appear generally to be well screened and well-maintained.
The building on the site was a former gas station and it was the only improvement that stood on the property. That building was demolished in the Summer of 1991. Prior to this condemnation it had been vacant for many years. The building itself was constructed in 1950, was of cement block-type construction and had a concrete foundation and concrete slab. It measured 27 feet by 61 feet and contained 1,647 square feet. The 61 feet dimension (which is the front and rear of the building) runs in a generally easterly and westerly direction) while the 27 foot dimension (which are the sides of the building) runs in a generally northerly and southerly direction).
This lot is in an R-20 (Residential) zone which requires a minimum area of 20,000 square feet, and is subject to front and rear yard requirements of 50 feet and side yard requirements of 20 feet. Because this site is a corner lot Burlake Road (the north bound of the site) is considered the frontage and Mohegan Avenue Parkway (the easterly bound of the site) is considered the side yard. A substantial portion of the area occupied by the block building which housed the former gas station is outside the permissible buildable area in this R-20 zone. These premises also contain a septic system that was used in connection with the former site use as a gasoline station. There is also some asphalt concrete paving on a portion of the site. There is also a drainage ditch or water course in the southeasterly portion of the CT Page 6531 site and it runs in a generally easterly westerly direction. Municipal water is available but sewage disposal continues to be by septic system methods.
 II.
We examine now the matter of the damages to the appellant Murphy by the defendant town for this taking. Both parties offered expert testimony through real estate appraisers — Jerome Silverstein for Murphy and Edgar Russ for the town. Mr. Murphy, the owner, also testified. In addition, the town offered the testimony of Patricia Snarski who is the environmental planner for the Town.
Before our analysis several principles may appropriately be noted. An owner whose property is taken for public use is entitled to just compensation. Connecticut Printers Inc. v. Redevelopment Agency, 159 Conn. 407, 410 (1970). "The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value. D'Addario v. Commissioner of Transportation, 180 Conn. 355,365, 429 A.2d 890; Tandet v. Urban Redevelopment Commission,179 Conn. 293, 299, 426 A.2d 280; Connecticut Printers, Inc. v. Redevelopment Agency, 159 Conn. 407, 410-11, 270 A.2d 549; Stanley Works v. New Britain Redevelopment Agency, 155 Conn. 86, 102,230 A.2d 9. See, E. Pollack "The Supreme Court of Connecticut 1968-1969, Eminent Domain, Special Use," 45 Conn. Bar Journal 40, 64 (1971). Put in another way, the rule is that the trier must take into consideration everything by which value is legitimately affected including those factors which a willing buyer and a willing seller would consider in fairly and advantageously negotiating an agreement. Mazzola v. Commissioner of Transportation, 175 Conn. 576, 582, 402 A.2d 786; Connecticut Printers, Inc. v. Redevelopment Agency, supra, 411." Wronowski v. Redevelopment Agency of City of New London, 150 Conn. 575, 585-586
(1980). Damages awarded as just compensation are to be measured as of the date of the taking. Stanley Works v. New Britain Redevelopment, 155 Conn. 86, 102 (1967); Textron Inc. v. Commissioner of Transportation, 176 Conn. 264, 267 (1978); New Haven Redevelopment Agency v. Costello Estate, 1 Conn. App. 20, 21
(1983).
The trier of fact determines the credibility of witnesses, the weight to be given their testimony and in discharging that function may consider its observation of the demeanor and conduct CT Page 6532 of the parties and other witnesses. Robert Lawrence Associates, Inc. v. Del Vecchio, 178 Conn. 1, 14 (1979); Lupien v. Lupien,192 Conn. 443, 415 (1984). "The credibility of . . . expert witnesses and the weight to be given to this testimony are within the province of the trier of facts, who is privileged to adopt whatever testimony he reasonably believes to be credible." New Haven Water Co. v. Board of Tax Review, 166 Conn. 232, 240 (1976) quoted in French v. Clinton, 205 Conn. 197, 204 (1990)." In condemnation proceedings, the trial court is more than a trier of facts or an arbiter of differing opinions of witnesses; it is charged with the duty of making an independent determination of value and fair compensation in light of all the circumstances, the evidence, its general knowledge and its viewing of the premises." D'Addario v. Commissioner of Transportation, 180 Conn. 355, 366
(1980) quoted in French v. Clinton, supra 201.
In this case, the owner, Thomas Murphy, testified. He said that he had been working with and/or acting as the "backer" for one Kennedy to develop this property when Kennedy owned it. Murphy also said that he was helping Kennedy financially. Kennedy had purchased the property in the '70s but had never operated it as a gasoline station. Actually there is no evidence of any use to which Kennedy put this property. Applications to Waterford authorities to use the site commercially had been made but were denied including for its use as gas station. The earlier nonconforming use of the site as a gasoline station had been lost by the abandonment of that use. Murphy said that in trying to develop this site, that he had contacted one Roger Nelson who Murphy said told him that with some renovations of the block-type building on the site, the bottom part of that building would accommodate the placement of a $64,000 modular home on it. No documentation of any sort concerning this undertaking was introduced nor did Mr. Nelson appear and testify. In any event, Murphy purchased this property from Kennedy after the latter ran out of money. An attempt to develop the site for use as offices by Kennedy and Murphy was unsuccessful. Murphy acquired title to it by a quit-claim deed from Kennedy in August 1990 in which the indicated purchase price was $21,336. Murphy said that he believed that that price was fair market value at that time. "Although there is authority to the contrary, the owner of the land is generally held to be qualified to express his opinion of the value merely by virtue of his ownership. He is deemed to have sufficient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use, to have a reasonably good idea of what it is worth." 5 Nichols, Eminent Domain (Rev.3d Ed 1989) 118.4[2]. The credible evidence, however, would indicate that the transfer from Kennedy to Murphy was not truly an "arm's length" transaction.
Silverstein, the plaintiff's expert, opined that the fair CT Page 6533 market value of the property, as of April 25, 1991, was $65,000. That figure allotted $45,000. to the land value and $20,000. to the depreciated price of the building. He used the "cost approach" to value. He believed the highest and best use was residential "with a home occupation as a secondary use." In doing so he determined that the site was "a vacant lot with an older gasoline station that could be used for a foundation for a dwelling."
Russ, the defendant's expert opined that the fair market value of the property, as of April 25, 1991, was $35,000. He determined that the fair market value of the property was $40,000. from which he deducted $5,000., his estimate of the cost of demolition of the building, and thus, arrived at $35,000. He employed he "market approach" to value. In his view, the "Highest and Best Use is for municipal and highway purposes." Both appraisers referred to sales of comparable properties which were not particularly illuminating on the issue of fair market value of the subject property.
While the matter of ground contamination allegedly arising from the site's former use as a gas station will be discussed in more detail below, it should be pointed out here that neither Silverstein or Russ took that into consideration in making their respective appraisals, although both acknowledged that they knew of the earlier use of this property as a gasoline station. Silverstein made no "contamination investigation" for his appraisal. Russ' report said that he had been "advised that all underground gasoline storage tanks [had] been removed and [that he relied] or this information as being accurate" and that he "further [assumed] there is no pollution or unknown underground condition which will affect future use of the site.[1] The witness Snarski elaborated on the ground contamination aspect of the evidence.
The defendant claims that the plaintiff's contention that highest and best use of the property was for use as a residence has not been proven by the evidence. The court recognizes that the property is located in a residential zone. The vertical ledge which arises above ground in the westerly portion of the site contributes not only to making the site uncomely and unadaptable for residential purposes but also serves to isolate it from drawing upon the attractiveness of well-screened and landscaped properties to the west on Burlake Road and those further to the south. The heavy traffic on Route #32 to which it is exposed without the benefit of any screening is a negative factor to residential use. It is true that there are other residential uses in the area on Route #32 but it would appear that they do not proliferate close to this site. The view suggested that such uses were generally better circumstanced physically and screened better CT Page 6534 than this site. Even accepting arguendo Silverstein's statement that this was "an excellent residential area" the court cannot agree that this site itself contributes to that designation. Moreover, certain other aspects militate against an acceptance of the plaintiff's claim not only as to its highest and best are as residential but also ultimately to value.
The plaintiff's expert did not factor into his opinion of value that a substantial portion of the block building which was to renovated to accommodate the placement of the modular home referred to actually was not within the permissible buildable area for a residence. Here we refer to front yards and side yard requirements. He maintained that he consider the "Risk" of the owner's not getting a variance in setting his opinion of fair market value saying the owner "possibly" would get a variance. See Transportation Plaza Associates v. Power, 203 Conn. 364, 375-376
(1987) (reasonable probability of obtaining a zoning change is a factor to be considered). As to the leaching field for the septic system presently on the property the evidence demonstrated that that would have to be updated to comply with the requirements for use in connection with a residence given the former function of the septic system of serving a gasoline station some years ago compared to a proposed residential use.
Although Silverstein attributed $20,000. of his value estimate of $65,000. for the property taken as the "depreciated price of the building", we note that Russ' written appraisal and testimony was not broken down at all in this regard.[2] Russ simply indicated that, as of the date of his appraisal (which was before the building was demolished), the value of the subject property "as of this date if vacant is estimated at $40,000." Russ then deducts $5,000. for the cost of demolition of the building yielding his opinion of a "net value" of $35,000.
"We are aware that the power of eminent domain embraces buildings and other structures (unless exempted by law), 29 Am.Jur.2d, Eminent Domain, 82 and that the condemnee is entitled to just compensation within the rationale of the view of such entitlement: for "every kind of right or interest in property which has a market value." See Slavitt v. Ives, 163 Conn. 198, 207
(1972); Toffolon v. Avon, 173 Conn. 525, 539 (1977). "Every structure which has `been erected and affixed to the soil so far as to become part of the real estate' is taken by the condemnor as a matter of law and `the value of the buildings must be considered in determining the compensation to be awarded to the owner.' 2 Nichols, Eminent Domain (Rev.3d Ed.) 5.81(1)" Toffolon v. Avon, supra 534. The building, now demolished, was standing on the dates on which Russ as well as Silverstein examined this property. Russ maintained that the building had no usable value as a residence. Under the circumstances the court does not accept CT Page 6535 Russ' estimate of $5,000. for the projected demolition of the building on this property; no breakdown of the $5,000. figure was given.
Based on all the evidence, the court concludes that the highest and best of the subject property was that for which the Town had condemned it. That was stated to be for municipal and road purposes. This use involved improving the access to Burlake Road and providing for commuter parking. The plaintiff has not demonstrated that its highest and best is residential as he claims. He has not removed that claim from the area of speculation and his claim of the probability of such a use remains unproven and, therefore, the plaintiff's claim for residential use cannot legitimately affect valuation. See Tandet v. Urban Redevelopment Commission, supra 300. The highest and best use as ascertained by the court will, therefore, be used on the fair market value. Particularly significant to its highest and best use is the ideal location of the subject property to the having traveled Route #32 a.k.a. Route #395. Actually, the south bound ramp off Route #395 to the area of the subject is according to Russ, located only several hundred feet from the plaintiff's property. As owner of real property that is condemned is entitled to have the fair market value of his property determined by reference to its highest and best use. See Olson v. United States, 292 U.S. 246, 255 (1934); United States v. 1291.83 Acres of Land, Commonwealth of Kentucky, 411 F.2d 1081, 1084-1086
(6th Cire. 1969); 4 Nichols, Eminent Domain (3d Ed.) 112.314.
It is important to indicate that the settled rule on the matter of just compensation that "the question is what the owner has lost, not what the taker has gained." United States v. Certain Property located in the Borough of Manhattan etc. 344 F.2d 142,146 (2d Cir. 1965) quoting from Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195 (1910); Schwartz v. City of New London, 20 Conn. Sup. 21, 24 (1955). Nichols puts it this way: "The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not of the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, and not what the owner has gained." Nichols, Eminent Domain (Rev.3d Ed. 1989) 8.61. The damages due the owner by way of just compensation are to be determined as of the date of the taking. At that time the plaintiff's property was improved by the concrete building which was thereafter demolished.
The plaintiff is found aggrieved by the statement of compensation filed April 25, 1991 and based on the law and the credible evidence the court concludes that the property taken by the town had a fair market value of $45,000.00. The town's expert Russ deducted $5,000. from his opinion of value for the cost of CT Page 6536 demolishing the building, i.e. the former gas station. Other than the mere statements of this $5,000. figure given there was as already noted no indication of what this $5,000. was composed of in any fashion. Any attempt by this court to assess the cost of such demolition, assuming it should be allowed, would of course, be sheer speculation and the court will not do so.
 III.
Before, however, judgment may be entered in this matter another issue should be resolved. It is the defendant Town's position that the "environmental contamination" discovered on the property after the date of taking, is a factor which would be considered by a willing and knowledgeable seller and a willing and knowing each buyer in arriving at the fair market value of the parcel" and, therefore, under the statutory scheme, Connecticut General Statutes, Chapter 446k entitled "Water Pollution Control" any award of just compensation to the plaintiff owner Murphy must be reduced by the sum of $4,732.44 which is said to be the cost to the town to date for cleaning up this environmental contamination.
In making this argument the town refers to specific statutes, including General Statutes 22a-452a entitled "State lien against real estate for amounts paid to cleanup hazardous waste." Moreover, it also expressly reserves its right to seek further reimbursement from the prior owners if further costs are incurred. The plaintiff, on the other hand, argues that the contamination found on the property six months after the taking is responsibility of the town and does not affect the fair market value on the date of taking. Events subsequent to the taking are, contends the plaintiff, irrelevant. He argues that Russ, the Town's appraiser, opined that a prudent buyer of a former gasoline station site would conduct tests to determine whether any contamination existed on the site. Assuming this to be true, the plaintiff then contends that the town was not a prudent buyer as it conducted no such tests although it full well knew its earlier use.
Before analyzing this issue some additional factual background should be set out. The subject property is the site of a former gasoline station and that use has been abandoned for a number of years prior to the taking. Neither the plaintiff Murphy nor Kennedy, who acquired the property sometime in the 1970's have ever used this property as a gasoline station. According to Russ, the plaintiff's expert, the building has been boarded up and unused for at least 15 years. It had, however, apparently been used as a gasoline station, prior to the acquisition of the property by Kennedy. Certain evidence at the trial referred to it as a "former Texaco station". Certain underground gasoline storage tanks had been removed prior to the condemnation of April CT Page 6537 25, 1991. That had been done in 1988[3] under the supervision of the Connecticut Department of Environmental Protection. After its condemnation the town "discovered" ground contamination at the site. Tests were conducted with samples being taken. This testing disclosed the presence of hydrocarbons inter alia which was described as basically "oil sludge". This is an offending substance the presence and disposal of which is controlled by statute. A number of drums of this sludge has since been removed by the town off the premises and some additional sludge remains there to be removed. As a result of the contamination investigation by the town, it has also caused to be removed a 1000 gallon underground storage tank and two 50 gallon hydraulic lifts tanks with piping from beneath the ground. These removals were done about September 1991. The 1000 gallon tank was located generally southeasterly of the building. The hydraulic lift tanks were apparently under what would have been the floor of the building. To date the town has expended $4,732.44 for the testing and removal referred to.
In arguing that the plaintiff is responsible in this proceeding for the $4,732.44 already expended for cleanup, the defendant town claims that because the plaintiff has not proven that the $35,000 determined upon by it is inadequate compensation that this court should therefore find that the damages to be warded to the plaintiff to be $30,276.56, i.e. $35,000.00 less $4,732.44. In doing so, the defendant town advances no authority for the proposition that it is entitled, in this condemnation proceeding, to require that the amount found to constitute just compensation due the plaintiff be reduced as claimed. A plaintiff owner whose property has been taken for public use by condemnation is entitled to just compensation. See e.g. Laurel Inc. v. Commissioner of Transportation, 180 Conn. 11, 36 (1980). Conn. Constr. Art I 411. "`Just compensation' as required by the federal and state constitution for private property to him for public use means `the fall, perfect and exact equivalent for the property taken. . . ." Textron v. Commissioner of Transportation, 176 Conn. 264
(1978). Whatever rights are sought to be appropriated in eminent domain must be taken absolutely and unconditionally." 26 Am.Jur.2d Eminent Domain 154. "`Compensation' as used in the constitutional provision as a limitation upon the power of eminent domain, implies a full and complete equivalent (usually monetary) for the loss sustained by the owner whose land has been taken or damaged." 3 Nichols, Eminent Domain, 8.6 Nor can legislation diminish the constitutional command of entitlement to just compensation. See Nichols, Eminent Domain 8.6. On this ground alone, i.e because the Connecticut Statutory scheme provides for reimbursement of cleanup expenses the defendant town cannot require the reduction, in this particular proceeding, of the amount determined to constitute just compensation for this taking. CT Page 6538
Nor is such a conclusion required to be otherwise in this particular proceeding because of a consideration upon which the town has made no claim but which this court nevertheless believes some comment should be made. That is that ". . . the question of what is just compensation is an equitable one rather than a strictly legal or technical one. The paramount law intends that the condemnee shall be put in as good condition percuniarily by just compensation as he would have been in had the property not been taken . . ." Gentile v. Ives, 159 Conn. 443, 447-448 (1970); Colalucca v. Ives, 150 Conn. 521, 530 (1970).
Insofar as any equitable considerations might be present in this case to permit diminishing what is just compensation by $4,732.44 the following considerations should be pointed out. It is, fair to say that the town knew of the use of these premises as a gasoline station for many years because, for example, local authorities, under statutory law, have had to approve of the application to employ property for such a use for many years. See General Statutes 14-321, see also 14-312
(1958 Rev. General Statutes). Even if we assume that the ground contamination in this case was not visible to the naked eye, the potential for it is readily suggested, even to a layman, where premises have been used as a gasoline station. In this case, it was not definitely established when it was last so used. Kennedy, the plaintiff's predecessor did not so use it, and he purchased the site sometime in the 1970's. Actually, the evidence does not show who Kennedy purchased this property from. Kennedy petitioned town authorities to permit him to use it as a gasoline station and that was denied. At the time of the taking, the town did not, prior to the taking, chargeable with the notice of its former use as a gas station, undertake to obtain permission from the owner to conduct any environmental inquires or testing to try to learn whether an environmental problem or the potential of one might exist such that it would impact on value. See generally General Statutes48-13.
In this proceeding it is concluded that even recognizing that the matter or just compensation is not strictly legal but equitable, the circumstances just set out definitely militate against permitting, if it could ever be the case, of reducing the just compensation constitutionally due this plaintiff in this particular proceeding.
Assuming that the defendant could, nevertheless, in this proceeding, properly make a cognizable claim of reduction of the just compensation due, an examination of the claims it makes in that regard does not avail the town on the evidence before us. There is no question but that at the time of the taking Connecticut had a complex statutory scheme that regulated the use of hazardous products and which provided for imposing liability CT Page 6539 for contamination caused by such products. There the town refers to several statutes in that statutory scheme. It first points to22a-452 entitled "Reimbursement for containment or removal costs, and which is in Chapter 446k of our statutes and is entitled "Water Pollution Control." Liability for certain acts or omissions." That provides in relevant part as follows:
"(a) Any person, firm, corporation or municipality which contains or removes or otherwise mitigates the effects of oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes resulting from any discharge, spillage, uncontrolled loss, seepage or filtration of such substance or material or waste shall be entitled to reimbursement from any person, firm or corporation for the reasonable costs expended for such containment, removal or mitigation, if such oil or petroleum or chemical liquids or solid, liquid or gaseous products or hazardous wastes pollution or contamination or other emergency resulted from the negligence or other actions of such person, firm or corporation. When such pollution or contamination or emergency results from the joint negligence or other actions of two or more persons, firms or corporations, each shall be liable to the others for a pro rata share of the costs of containing, and removing or otherwise mitigating the effects of the same and for all damage caused thereby."
The town then refers to Chapter 445 of the General Statutes "Hazardous Waste" and specifically to 22a-134 in that chapter which is entitled "Transfer of Hazardous Waste Establishments: Definitions". There it points out that the state regulates the transfer of gasoline stations pursuant to 22a-134. It says that essentially 22a-134 requires the seller in a "transfer of establishment" to provide a "negative declaration" to the purchaser of the property with a requirement that a copy of that "negative declaration" be forwarded to the Commissioner of Environmental Protection. Turning to 22a-134a the town then points out that if under that statute the "owner or seller" (actually the statute says "owner or operator") is unable to submit the required "negative declaration" then the "purchaser" (actually the statute says "transferee or other party to the transfer") shall certify to the Commissioner that . . . that to the extent necessary to minimize or mitigate a threat to human health or the environment, he shall contain remove or otherwise mitigate the effects of any discharge, spillage, uncontrolled loss, seepage or filtration of hazardous waste on-site in accordance with procedures and a time schedule approved by the commissioner pursuant to an order, stipulated judgment or consent agreement." Acknowledging that the three statutes referred to are only part of a complex body of law by which the state and federal government address ground contamination and hazardous waste disposal and control the town stresses that a consideration of the past use of CT Page 6540 the property "would have a significant effect on the valuation of the property for sale." It argues that "uncontradicted testimony exists[4] on this site of contamination which has required a clean up and which will require future expenditures of moneys for additional cleanup and, accordingly, the town concludes that "pursuant to statute, the cost of the cleanup would be borne directly by the owners of the property pursuant to the above-cited statutory scheme in this case of at least $4,732.44.
The town does not discuss whether it is appropriate to advance any such claim in this eminent domain proceeding, a proceeding in which the plaintiff property owner is "required to yield involuntarily" to the condemnor's demand, see Thomaston v. Ives, 156 Conn. 166, 174 (1968). Nor does it discuss the earlier use of this site as a gasoline station of which use the town has known for years and yet, despite that knowledge and its apparent potential for ground contamination no precondemnation request for any environmental investigation was made. Any such precondemnation request for an environmental investigation aside, the town is chargeable with knowledge of its prior use as a gasoline station.
The town also refers to General Statutes 22a-452e. That statute provides for reimbursement for reasonable containment or removal costs ". . . from any person, . . ." where the materials removed or hazardous waste, water pollution or contamination . . . resulted from the negligence or other actions of such person, . . . ." It also provides that where such pollution or contamination ". . . results from the joint negligence or other actions of two or more persons, . . . each shall be liable to the others for a pro rata share of the costs . . ." of the removal or containment, thus making, it appears for a sort of contribution among joint offenders. The town has not proven its entitlement to reimbursement in this proceeding under this statute nor in conjunction with any other relevant statute evidence. Neither the plaintiff nor his predecessor in title have been proven to have been negligent. The contamination involved has not been proven to have "resulted" from the plaintiff's negligence nor that of his predecessor Kennedy but also it has not been shown to have "resulted" from "other actions" of the plaintiff (or his predecessor Kennedy). There must be a causal connection between the plaintiff's conduct and the contamination before the plaintiff (who is the condemnee and from whom reimbursement is sought in this case) and the contamination that generated the expenses claimed. See Colormade One v. Electrolux Corporation, et al., 767 F. Sup. 1215, 1218 (D.Conn. 1991). No such causation has been proven, it must be.
It must be kept in mind that 22a-252(a) speaks to "negligence or other action" of an "offender"; the statute this sounds in terms of actual human conduct. Even with strict CT Page 6541 liability, traditional tort law has recognized causation as a defense. See W. Prosser, Handbook of the Law of Torts 79 at p. 517 (1971). More to the point, this has been so held in environmental cases. See e.g. Colormade One v. Electrolux Corporation, et al., supra. ". . .Strict liability does not abrogate the necessity of showing causation, but merely displaces any necessity for showing some degree of culpability by the action (of the plaintiff on this case). In other words, under strict liability the mental state of the (actor) is irrelevant, but the damage for which recovery is sought must be causally linked to the (actor)" State of Idaho v. Bunker Hill Co., 635 F. Sup. 665, 674
(D.Idaho 1986). No claim is cognizable on the credible evidence that the requisite causation existed between the plaintiff (or even Kennedy) and the necessity for the cleanup expenses of $4,732.44 so as to make the plaintiff liable to reimburse the town for such expenses under 22a-452(a) and reimbursement is, therefore, denied, on that ground. Additionally, no such claim could be sustained even if made against Kennedy but the claim of the town is not against him here.
Going on, we take up the reimbursement claim under General Statutes 22a-134 and 22a-134a which are General Statutes Chapter 445a which chapter is entitled "Hazardous Waste Management Service". Section 22a-134 entitled "Transfer of hazardous waste establishment Definitions "is, as the title indicates a definitional section which definitions specifically apply only to22a-134 through 22a-134d. Among its definitions are those of "transfer of establishment" "establishment", "negative declaration" "service station" and "transfer of a service station." The latter two definitions were not in this statute until 1987.
In the view of this court these statutes, i.e. 22a-134 and22a-134a are not applicable under the particular circumstances of this condemnation case. Section 22a-134 specifically defines what a "service station" means in subsection 6 and subsection 7 defines what the "Transfer of a service station" means. There is no question but the "transfer of a service station" in subsection 7 is a "transfer, as defined in this section. . . ." Subsection 6 says that "`Service station' means a retail operation involving the resale of motor vehicle fuel, including, but not limited to gasoline, diesel fuel and kerosene." A definition which declares what a term means . . . excludes any meaning that is not stated." 2A Sutherland Statutory Construction 42.07, p. 152. Such a definition is not like a term whose statutory definition declares what it "includes" and thus susceptible to extension by construction than where the definition declares what the term means. Id. See also Neptune Parts Assn. v. Steinberg, 138 Conn. 357,363 (1991). The 1987 legislative action adding subsections (6) and (7) clearly intended to be very specific about the CT Page 6542 additional definition in those subsections particularly where it had some years earlier defined what a "transfer of establishment" was in subsection (1). In construing a statute, no word should be treated as superfluous or insignificant and words and phrases are to be construed according to the common usage of the language. Kulis v. Moll, 172 Conn. 104, 111 (1976); Wiegand v. Hefferman,170 Conn. 576, 581 (1976). Common sense should also be used on statutory construction. Stoni v. Wasicki, 179 Conn. 372, 376-377
(1979).
In subsection 6 the words "a retail operation" are used. Webster defines the verb "retail" as meaning "to sell directly to the ultimate consumer, to sell in small quantities." Webster's Third New International Dictionary. Interestingly, though set out in Chapter 250 of the General Statutes which itself is entitled "Gasoline and Motor Oil Sales" section 14-318(b) provides that "`Retail dealer `means any person operating a service station, filling station, store, garage or other place of business for the sale of motor fuel for delivery into the service tank or tanks of any vehicle propelled by an internal combustion engine." (underlining added). This definition, is not controlling but is instructive. The term "retail", however when paired in 122a-34, with the term "operation", clearly can be said to mean an ongoing, presently existing business. See definition of "operation" Webster's Third New International Dictionary. There was no "retail operation" of a "service station" on this property on the taking date nor for many many years prior and so there could be no "transfer" of a service station" under 22a-134(7) by the town's taking. Given that, there was no requirement for this plaintiff to furnish the "negative declaration" defined in 22a-134a. Parenthetically, there was no evidence at all that such a "negative declaration" had not been filed. A statement by counsel that one had not filed is not evidence as representations of counsel are not evidence. See Cologne v. Westfarms Associates,197 Conn. 141, 158 (1985). The court concludes that these sections of the statutory scheme, i.e. 22a-134 through 22a-134d
are not, under the facts of this case applicable. Therefore, the town is not entitled in this proceeding the reimbursement claimed in the amount of $4,732.44.
 IV.
We take up now the plaintiff's request for appraisal fees in the amount of $600.00. This amount is found to be reasonable and it is awarded.
 V.
In sum, judgment is entered for the plaintiff, Thomas Murphy, who has been found aggrieved, against the defendant town of CT Page 6543 Waterford in the amount of $45,000.00 plus interest at the rate ten per cent per annum on the excess of that sum over the $35,000.00 set out in the April 25, 1991 statement of compensation. In addition, the plaintiff is awarded $600.00 as reasonable appraisal fees. The claim by the defendant town for reimbursement for cleanup expenses in the amount of $4,732.44 is denied.
Arthur H. Healey State Trial Referee